Carolyn D. Richmond, Esq.
Ernest Edward Badway, Esq.
Jason B. Jendrewski, Esq.
Fox Rothschild LLP
101 Park Avenue, Suite 1700
New York, New York 10178
Telephone: (212) 878-7900
Facsimile: (212) 692-0940
*Attorneys for defendants 172nd LLC, 170 Too*
  *Bedford, LLC, and 170 Bedford Restaurant LLC*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| DAN GROPPER,<br><br>　　　　Plaintiff,<br><br>– against –<br><br>172ND LLC, 170 TOO BEDFORD, LLC AND<br>170 BEDFORD RESTAURANT LLC,<br><br>　　　　Defendants. | **ECF Case**<br><br>**16-cv-05358 (RML)**<br><br>**STATEMENT OF MATERIAL**<br>**FACTS PURSUANT TO**<br>**<u>LOCAL CIVIL RULE 56.1</u>** |

　　　　Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rule 56.1 of

the Local Rules of the United States District Courts for the Southern and Eastern Districts of

New York, defendants 172nd LLC, 170 Too Bedford, LLC, and 170 Bedford Restaurant LLC

("The Meatball Shop") (collectively, "Defendants"), by their attorneys Fox Rothschild LLP,

hereby submit the following statement of material facts where they contend there are no genuine

issues to be tried:

　　　　1.　　　　Between March 28, 2013, and March 16, 2017, plaintiff Dan Gropper ("Plaintiff")

filed 15 lawsuits in the United States District Courts for the Southern and Eastern Districts of

New York (collectively, "Lawsuits"), including the above-captioned action.  *See Gropper v.*

*Peter Luger of Long Island, Inc.* (E.D.N.Y. Index No. 2:13-cv-03384-LDW-ARL); *Gropper v.*

*Sourth Park Realty Corp.* (E.D.N.Y. Index No. 2:13-cv-03385-JS-AYS); *Gropper v. CTJ Realty Corp.* (E.D.N.Y. Index No. 2:13-cv-03386-SJF-ARL); *Gropper v. Hassard by TR Arthur J* (E.D.N.Y. Index No. 2:13-cv-03387-JS-ARL); *Gropper v. 172nd LLC* (E.D.N.Y. Index No. 1:16-cv-05358-RML); *Gropper v. West 15 Townhouse Corp.* (S.D.N.Y. Index No. 1:13-cv-02067-VSB); *Gropper v. David Ellis Real Estate, L.P.* (S.D.N.Y. Index No. 1:13-cv-02068-ALC-JCF); *Gropper v. Fine Arts Housing, Inc.* (S.D.N.Y. Index No. 1:13-cv-02820-DLC); *Gropper v. 810-257 Water Street, LLC* (S.D.N.Y. Index No. 1:13-cv-02821-NRB); *Gropper v. Duane Street Realty LLC* (S.D.N.Y. Index No. 1:13-cv-06389-GBD); *Gropper v. 787 Holdings, LLC* (S.D.N.Y. Index No. 1:13-cv-06391-PKC); *Gropper v. 200 Fifth Owner L.L.C.* (S.D.N.Y. Index No. 1:14-cv-01265-SAS); *Gropper v. 40 Mercer Street Condominium and RL Mercer Street LLC* (S.D.N.Y. Index No. 1:14-cv-05430-KBF); *Gropper v. 160 East 48th Street Owner II LLC* (S.D.N.Y. Index No. 1:16-cv-05377-RA); *Gropper v. West Village LLC* (S.D.N.Y. Index No. 1:17-cv-01939-PKC).  *See also* Declaration of Ernest Edward Badway, dated October 4, 2019 ("Badway Decl."), Exhibits 1 and 2.

2.     All of Plaintiff's Lawsuits concern allegations of disability discrimination in violation of Title III of the Americans with Disabilities Act, the New York Executive Law, the New York State Civil Rights Law, and/or the Administrative Code of the City of New York.  See *Gropper v. Peter Luger of Long Island, Inc.* (E.D.N.Y. Index No. 2:13-cv-03384-LDW-ARL); *Gropper v. Sourth Park Realty Corp.* (E.D.N.Y. Index No. 2:13-cv-03385-JS-AYS); *Gropper v. CTJ Realty Corp.* (E.D.N.Y. Index No. 2:13-cv-03386-SJF-ARL); *Gropper v. Hassard by TR Arthur J* (E.D.N.Y. Index No. 2:13-cv-03387-JS-ARL); *Gropper v. 172nd LLC* (E.D.N.Y. Index No. 1:16-cv-05358-RML); *Gropper v. West 15 Townhouse Corp.* (S.D.N.Y. Index No. 1:13-cv-02067-VSB); *Gropper v. David Ellis Real Estate, L.P.* (S.D.N.Y. Index No. 1:13-cv-02068-

ALC-JCF); *Gropper v. Fine Arts Housing, Inc.* (S.D.N.Y. Index No. 1:13-cv-02820-DLC); *Gropper v. 810-257 Water Street, LLC* (S.D.N.Y. Index No. 1:13-cv-02821-NRB); *Gropper v. Duane Street Realty LLC* (S.D.N.Y. Index No. 1:13-cv-06389-GBD); *Gropper v. 787 Holdings, LLC* (S.D.N.Y. Index No. 1:13-cv-06391-PKC); *Gropper v. 200 Fifth Owner L.L.C.* (S.D.N.Y. Index No. 1:14-cv-01265-SAS); *Gropper v. 40 Mercer Street Condominium and RL Mercer Street LLC* (S.D.N.Y. Index No. 1:14-cv-05430-KBF); *Gropper v. 160 East 48th Street Owner II LLC* (S.D.N.Y. Index No. 1:16-cv-05377-RA); *Gropper v. West Village LLC* (S.D.N.Y. Index No. 1:17-cv-01939-PKC).  *See also* Badway Decl., Exhibits 1 and 2.

3.      In the Complaint filed in the above-captioned action on September 27, 2016 ("Action"), Plaintiff alleges specific barriers to access at and/or inaccessible features of The Meatball Shop restaurant located at 170 Bedford Avenue, Brooklyn, New York.  *See* Badway Decl., Exhibit 3, at ¶ 24.

4.      Defendant 172nd LLC owns the property located at 170 Bedford Avenue, Brooklyn, New York.  *See* Badway Decl., Exhibit 3, at ¶ 7; Badway Decl., Exhibit 4, at ¶ 7; Declaration of Jay Weiss, dated October 18, 2019 ("Weiss Decl."), at ¶ 1.

5.      Defendant 170 Too Bedford, LLC leases certain property located at 170 Bedford Avenue, Brooklyn, New York, from defendant 172nd LLC (170 Too Bedford, LLC and 172nd LLC shall collectively be referred to as the "Landlord").  *See* Declaration of Michael Kaye, dated October 18, 2019 ("Kaye Decl."), at ¶ 1.

6.      The Meatball Shop subleases a portion of the property located at 170 Bedford Avenue, Brooklyn, New York, from defendant 170 Too Bedford, LLC.  *See* Badway Decl., Exhibit 3, at ¶ 9; Kaye Decl., at ¶ 1; Declaration of Daniel Holzman, dated October 3, 2019 ("Holzman Decl."), at ¶ 2 and Exhibit 1.

3

7.      The building located at 170 Bedford Avenue, Brooklyn, New York ("Building") was erected prior to 1901.  *See* Weiss Decl., at ¶ 2 and Exhibit 1; Kaye Decl., at ¶ 2 and Exhibit 1.

8.      The Building has a cellar and four floors of commercial and residential space. *See* Holzman Decl., Exhibit 1; Weiss Decl., at ¶ 3; Kaye Decl., at ¶ 3.

9.      Defendant 172nd LLC acquired the Building on or about October 13, 2010.  *See* Weiss Decl., at ¶ 4.

10.     At the time that 172nd LLC acquired the Building and at the time that 172nd LLC entered into a lease with 170 Too Bedford, LLC, the first floor commercial space was located above the public sidewalk, and there was an existing step from the public sidewalk to the entrance of the first floor commercial space.  *See* Weiss Decl., at ¶ 5; Kaye Decl., at ¶ 4.

11.     In or about November 1, 2010, The Meatball Shop leased the first floor store area of the property at 170 Bedford Avenue, excluding the residential hallway and stair ("Subject Premises").  *See* Holzman Decl., at ¶¶ 2-3 and Exhibit 1.

12.     There are residential apartments on the floors above the Subject Premises.  *See* Holzman Decl., at ¶ 4.

13.     Defendants made modifications to the Subject Premises to create a restaurant at the Subject Premises.  *See* Holzman Decl., at ¶ 6 and Exhibit 2.

14.     Defendants' modifications to the Subject Premises to create a restaurant at 170 Bedford Avenue were completed in 2011.  *See* Holzman Decl., at ¶ 9 and Exhibit 2.

15.     Defendants retained Richard H. Lewis Architect for the modifications to the Subject Premises.  *See* Holzman Decl., at ¶ 8 and Exhibit 2.

16.     Richard H. Lewis Architect filed architectural plans for the modifications to the Subject Premises with the New York City Department of Buildings.  *See* Holzman Decl., at ¶ 8 and Exhibit 2.

17.     The Meatball Shop's restaurant at the Subject Premises opened in July 2011.  *See* Holzman Decl., at ¶ 10.

18.     The Meatball Shop has no record of Plaintiff having ever accessed or attempted to access the restaurant at the Subject Premises.  *See* Declaration of Rhon Glasgow, dated October 4, 2019 ("Glasgow Decl."), at ¶ 27.

19.     Plaintiff has never contacted or otherwise communicated with The Meatball Shop. *See* Glasgow Decl., at ¶ 27.

20.     There is one public entrance to the Subject Premises.  *See* Badway Decl., Exhibits 5, 6, and 7; Holzman Decl., at ¶ 5; Declaration of John Salmen, dated October 17, 2019 ("Salmen Decl."), at ¶ 15.[1]

21.     The sole public entrance to the Subject Premises is located on Bedford Avenue ("Retail Entrance").  *See* Badway Decl., Exhibits 5, 6, and 7; Salmen Decl., at ¶ 15.

22.     The Retail Entrance has a single entrance door.  *See* Salmen Decl., at ¶ 15.

23.     On the left side of the Retail Entrance (when facing the Building), there is a cellar hatch in the sidewalk that provides access to the basement of the Subject Premises ("Cellar Hatch").  *See* Badway Decl., Exhibits 6, 7, and 10, at p. 122, ll. 16-25; Salmen Decl., at ¶ 15.

24.     The Cellar Hatch precludes the installation of a permanent ramp to the left of the Retail Entrance because Defendants cannot block this emergency egress route from the basement

---

[1] All references to Badway Decl., Exhibit 7 shall be construed also to refer to Salmen Decl., Exhibit B, as the exhibits are the same document.

of the Building.  *See* Badway Decl., Exhibits 6, 7, and 10, at p. 122, ll. 16-25; Salmen Decl., at ¶ 18.

25.     The change in elevation between the street curb, public sidewalk and Retail Entrance, along with the width of the public sidewalk, precludes the installation of a permanent ramp perpendicular to the Retail Entrance.  *See* Salmen Decl., at ¶ 18.

26.     To the right side of the Retail Entrance (when facing the Building), there is a separate entrance next to the Subject Premises that provides access to residential apartments above the Subject Premises ("Residential Entrance").  *See* Badway Decl., Exhibit 7; Salmen Decl., at ¶ 15; Holzman Decl., at ¶ 4.

27.     There is a distance of 5'-6" between the Retail Entrance and the Residential Entrance.  *See* Badway Decl., Exhibit 7; Salmen Decl., at ¶ 16.

28.     Between the Retail Entrance and the Residential Entrance, a fire sprinkler connection protrudes from the face of the Building into the area above the sidewalk.  *See* Badway Decl., Exhibit 7; Salmen Decl., at ¶ 16.

29.     The Retail Entrance is recessed from the face of the Building by 1'-5".  *See* Salmen Decl., at ¶ 17.

30.     The Retail Entrance has one step that is 7 inches above the public sidewalk ("Step").  *See* Badway Decl., Exhibit 7; Salmen Decl., at ¶ 17.

31.     It is undisputed that the Step is, at minimum, 6-3/4 inches above the public sidewalk.  *See* Badway Decl., Exhibits 5 and 10, at p. 114, ll. 9-12.

32.     The Step extends 1'-5" from the recessed Retail Entrance to the face of the Building.  *See* Salmen Decl., at ¶ 17.

33.     The Step existed as of the date that The Meatball Shop entered into a lease agreement for the Subject Premises.  *See* Holzman Decl., at ¶ 5.

34.     The Step existed as of the date that 172nd LLC acquired the Subject Premises. *See* Weiss Decl., at ¶ 5.

35.     At the time The Meatball Shop entered into a lease agreement for the Subject Premises, there was one entrance to the Subject Premises on Bedford Avenue.  *See* Holzman Decl., at ¶ 5.

36.     Currently, there is one entrance to the Subject Premises on Bedford Avenue.  *See* Badway Decl., Exhibits 5 and 7; Salmen Decl., at ¶ 15.

37.     In 2015, prior to the commencement of the Action, The Meatball Shop investigated the feasibility of constructing a permanent ramp at the Retail Entrance.  *See* Holzman Decl., at ¶ 11 and Exhibits 3 and 4.

38.     The Meatball Shop did not construct a permanent ramp because its architect advised that it was not possible to construct a ramp with an ADA-compliant slope and railings due to the Residential Entrance, and the ramp would block an existing fire sprinkler connection in violation of the New York City Fire Code.  *See* Holzman Decl., at ¶ 12 and Exhibit 4.

39.     Plaintiff submitted a report that is entitled "Accessibility Compliance Status Report" and dated August 27, 2017 ("Plaintiff's Expert Report").  *See* Badway Decl., Exhibit 5.

40.     Plaintiff's Expert Report initially was drafted by Jonathan White.  *See* Badway Decl., Exhibit 5; *see also* Badway Decl., Exhibit 10, at pp. 54-55, ll. 23-6, and at pp. 58, ll. 7-24.

41.     Plaintiff submitted an architectural plan (titled "A1") for the alteration of the Retail Entrance that contains a design for the construction of a permanent ramp at the Retail Entrance ("Proposal").  *See* Badway Decl., Exhibit 6; Salmen Decl., at ¶ 19.

42.     Defendants submitted a rebuttal report by John Salmen, FAIA, in response to Plaintiff's Expert Report and the Proposal ("Defendants' Expert Report").  *See* Badway Decl., Exhibit 7; Salmen, Decl., ¶ 12.

43.     John Salmen, FAIA is a licensed architect and a Fellow of the American Institute of Architects.  *See* Badway Decl., ¶ 1.

44.     John Salmen, FAIA, visited the Subject Premises on four separate occasions, taking various measurements and photographs and observing The Meatball Shop's operations. *See* Salmen Decl., ¶ 9.

45.     John Salmen, FAIA, reviewed the documents produced by Defendants in the Action, including architectural plans/construction drawings for modifications to the Subject Premises.  *See* Salmen Decl., ¶ 7.

46.     John Salmen, FAIA, drafted Defendants' Expert Report.  *See* Badway Decl., Exhibit 7; Salmen, Decl., ¶ 12.

47.     Plaintiff has not submitted any designs or proposals for removing the alleged barrier posed by the Step, except for the Proposal.  *See* Badway Decl., Exhibit 10, at p. 73, ll. 20-25, and p. 119, ll. 19-25.

48.     The Proposal was prepared by Jonathan White.  *See* Badway Decl., Exhibit 6; *see also* Badway Decl., Exhibit 10, at p. 73, ll. 16-19.

49.     Jonathan White was an intern architect at the time that he prepared Plaintiff's Expert Report and the Proposal.  *See* Badway Decl., Exhibit 10, at p. 55, ll. 10-14.

50.     Jonathan White was not a licensed architect at the time that he prepared Plaintiff's Expert Report and the Proposal.  *See* Badway Decl., Exhibit 10, at p. 55, ll. 10-14.

8

51.     Plaintiff did not identify Jonathan White as an expert witness in this Action.  *See* Badway Decl., Exhibit 5.

52.     Plaintiff identified Dr. Edward Steinfeld as an expert witness in this Action.  *See* Badway Decl., Exhibit 5.

53.     Dr. Edward Steinfeld did not review any construction documents before Plaintiff's Expert Report was finalized.  *See* Badway Decl., Exhibit 10, at p. 60, ll. 13-16.

54.     Dr. Edward Steinfeld never visited the Subject Premises.  *See* Badway Decl., Exhibit 10, at pp. 59-60, ll. 25-6; *see also* Badway Decl., Exhibit 5.

55.     Dr. Edward Steinfeld did not conduct an inspection of the Subject Premises.  *See* Badway Decl., Exhibit 10, at pp. 59-60, ll. 25-6; *see also* Badway Decl., Exhibit 5.

56.     Dr. Edward Steinfeld did not take any measurements of or at the Subject Premises.  *See* Badway Decl., Exhibit 10, at p. 62, ll. 9-15; *see also* Badway Decl., Exhibit 5.

57.     Dr. Edward Steinfeld did not take any photographs of or at the Subject Premises. *See* Badway Decl., Exhibit 10, at pp. 61-62, ll. 23-8; *see also* Badway Decl., Exhibit 5.

58.     Dr. Edward Steinfeld did not draft the Proposal.  *See* Badway Decl., Exhibit 6; *see also* Badway Decl., Exhibit 10, at p. 73, ll. 16-17.

59.     Excluding the Proposal, Dr. Edward Steinfeld did not submit any designs, drawings, or proposals for an accessible entrance for or in connection with this Action.  *See* Badway Decl., Exhibit 10, at p. 73, ll. 23-25.

60.     The Proposal includes the construction of a top landing at the Retail Entrance, a ramp parallel to the Building's storefront, and a bottom landing directly in front of the Residential Entrance (collectively, "Ramp System").  *See* Badway Decl., Exhibit 6; Salmen Decl., at ¶ 19.

9

61.     The Proposal is not intended to be a construction drawing.  *See* Badway Decl., Exhibit 6.

62.     The Proposal states that it is "based on incomplete information, sidewalk elevations/slopes, property line locations, and basement hatch locations are estimated."  *See* Badway Decl., Exhibit 6.

63.     Jonathan White did not measure the distances and elevations of the various points along the proposed Ramp System.  *See* Badway Decl., Exhibit 10, at p. 125, ll. 6-12.

64.     Jonathan White did not use a laser level to measure any distances and elevations.  *See* Badway Decl., Exhibit 10, at p. 125, ll. 15-17; *see also* Badway Decl., Exhibits 5 and 6.

65.     Dr. Edward Steinfeld does not know if the Proposal would work because he does not have the actual elevations.  *See* Badway Decl., Exhibit 10, at p. 124, ll. 2-22.

66.     Dr. Edward Steinfeld cannot opine if it is possible to implement the particular design encompassed by the Proposal.  *See* Badway Decl., Exhibit 10, at p. 124, ll. 17-22.

67.     The Proposal shows that the Ramp System would extend more than 44" from the face of the Building.  *See* Badway Decl., Exhibit 6; Salmen Decl., at ¶ 22.

68.     The Proposal shows that the Ramp System would extend 5'-5" from the face of the Building.  *See* Badway Decl., Exhibit 6; Salmen Decl., at ¶ 22.

69.     The Proposal shows that the top landing of the Ramp System would be 5' long by 5' wide (60 inches by 60 inches), with a step between the sidewalk and the top landing of the Ramp System.  *See* Badway Decl., Exhibits 6 and 10, at p. 121, ll. 15-17; Salmen Decl., at ¶ 22.

70.     Due to the slope of the existing sidewalk and the depth of the new landing, the height of the top landing would be 8-5/8" above the existing sidewalk.  *See* Salmen Decl., at ¶ 22.

71.     The Proposal shows that the bottom landing of the Ramp System would be directly in front of the Residential Entrance and would not slope more than 2% in any direction. *See* Badway Decl., Exhibit 6; Salmen Decl., at ¶ 23.

72.     The Proposal states that the ramp of the Ramp System would be 5' long by 3' wide and have a slope of 1:10.  *See* Badway Decl., Exhibit 6; Salmen Decl., at ¶ 24.

73.     The Proposal shows that the ramp of the Ramp System would block the existing fire sprinkler connection on the face of the Building.  *See* Badway Decl., Exhibit 6; Salmen Decl., at ¶ 33.

74.     The location of the Residential Entrance restricts the length of the ramp of the Ramp System.  *See* Badway Decl., Exhibits 6 and 7.

75.     It is not possible for the ramp of the Ramp System to have a 1:12 slope because of the Residential Entrance.  *See* Badway Decl., Exhibit 10, at p. 122, ll. 9-15.

76.     The Residential Entrance is not part of the Subject Premises.  *See* Holzman Decl., Exhibit 1.

77.     A 5' long ramp with a slope of 1:10 would put the bottom landing 6" below the top landing.  As a result, due to existing elevations, the Proposal's bottom landing would be ½ inch above the sidewalk at the door to the Residential Entrance and approximately 1 inch above the sidewalk at its edge furthest from the Building.  *See* Salmen Decl., at ¶ 25.

78.     The Proposal shows that the bottom landing would be 5' long by 3' wide.  *See* Badway Decl., Exhibit 6; Salmen Decl., at ¶ 26.

79.     The Proposal shows that the bottom landing would be in front of the Residential Entrance.  *See* Badway Decl., Exhibit 6; Salmen Decl., at ¶ 26.

11

80.     The Proposal shows that the slope of the bottom landing would be a maximum of 1:48 perpendicular to the Building.  *See* Badway Decl., Exhibit 6; Salmen Decl., at ¶ 26.

81.     The Proposal shows a 1:20 sloped walkway perpendicular to the bottom landing of the Ramp System towards the Bedford Avenue curb.  *See* Badway Decl., Exhibit 6; Salmen Decl., at ¶ 26.

82.     The Proposal does not take into consideration the change in elevation of the existing sidewalk between the face of the Building and the street curb.  *See* Badway Decl., Exhibits 7 and 10, at pp. 123-124, ll. 15-16; Salmen Decl., at ¶ 27.

83.     Dr. Edward Steinfeld admits that the Proposal does not take into consideration the cross slope of the existing sidewalk.  *See* Badway Decl., Exhibit 10, at p. 125, ll. 18-21.

84.     The Proposal does not take into consideration the additional 1 inch of height above the sidewalk of the ramp's bottom landing.  *See* Salmen Decl., at ¶ 27.

85.     The Proposal miscalculates the distance that would be necessary for a new 1:20 sloped walkway to meet the surface of the sidewalk.  *See* Salmen Decl., at ¶ 27.

86.     A 1:20 sloped walkway, as shown in the Proposal, would be impossible due to the existing change in elevation of the sidewalk and the 1" of height of the Proposal's bottom landing above the existing sidewalk.  *See* Badway Decl., Exhibit 7; Salmen Decl., at ¶ 29.

87.     A 1:20 sloped walkway, as shown in the Proposal, would be obstructed by and require the relocation of a tree planting bed that is adjacent to the curb in the existing sidewalk. *See* Badway Decl., Exhibit 7; Salmen Decl., at ¶ 29.

88.     A 1:20 sloped walkway would need to extend into the street before it reached any existing ground surface.  *See* Salmen Decl., at ¶ 27.

89.     The distance between the street curb and the Step is approximately 15'.  *See* Badway Decl., Exhibit 5; Salmen Decl., at ¶ 28.

90.     The existing sidewalk between the Building storefront and street curb is sloped. *See* Badway Decl., Exhibit 7; Salmen Decl., at ¶ 28.

91.     Defendants' expert, John Salmen, FAIA, measured various points of elevation of the sidewalk from the face of the Building to the street curb using a Black and Decker CDL300S Auto Laser Level on October 9, 2017.  *See* Badway Decl., Exhibit 7; Salmen Decl., at ¶ 28.

92.     The slope of the existing sidewalk between the Building storefront and the street curb ranges from 3.4% to 6.8%.  *See* Badway Decl., Exhibit 7; Salmen Decl., at ¶ 28.

93.      The slope of the existing sidewalk between Building storefront and the street curb averages approximately 4%.  *See* Badway Decl., Exhibit 7; Salmen Decl., at ¶ 28.

94.     Due to the cross slope of the sidewalk, the top of the street curb is 7-1/2" below the bottom landing of the Proposal's Ramp System.  *See* Badway Decl., Exhibit 7; Salmen Decl., at ¶ 28.

95.     The horizontal distance between the bottom landing of the Ramp System in the Proposal and the street curb is 144 inches.  *See* Badway Decl., Exhibit 7; Salmen Decl., at ¶ 30.

96.     Due to the existing change in elevation of the sidewalk, the slope of a walkway between the bottom landing and the street curb would be steeper than 1:20 (5%) at 1/19.2 or 5.208%.  *See* Salmen Decl., at ¶ 30.

97.     The distance between the bottom landing of the Proposal's Ramp System and a turning space adjacent to the street curb that is 36" wide with a 2% maximum slope in any direction would be 108 inches.  *See* Badway Decl., Exhibit 7; Salmen Decl., at ¶ 31.

98.     Due to the distances and the change in elevation between the bottom landing and the required turning space, the slope of the walkway would be 1:14.4 or 6.94%.  *See* Badway Decl., Exhibit 7; Salmen Decl., at ¶ 31.

99.     Given the existing change in elevation of the sidewalk, plus the 1-inch of height of the bottom landing, the 1:20 sloped walkway would be required to be at least 150 inches long. With the required level turning space at the bottom of the 1:20 sloped walkway, it would extend beyond the street curb at least 42 inches into the street.  *See* Badway Decl., Exhibit 7; Salmen Decl., at ¶ 32.

100.    Dr. Edward Steinfeld opined that the sloped walkway potentially would need to project beyond the street curb to maintain the required 1:20 slope.  *See* Badway Decl., Exhibit 10, at p. 126, ll. 6-16.

101.    Before performing any alterations or modifications to or on the sidewalk in front of the Building and the Subject Premises, Defendants would be required to apply to and obtain permission from certain regulatory bodies, including the New York City Department of Transportation and the New York City Department of Buildings.  *See* Salmen Decl., at ¶ 20.

102.    Dr. Edward Steinfeld is not familiar with the New York City permitting and approval requirements for constructing the Proposal.  *See* Badway Decl., Exhibit 10, at p. 127, ll. 3-6.

103.    Dr. Edward Steinfeld does not know what regulatory bodies would need to approve the Proposal for it to be constructed.  *See* Badway Decl., Exhibit 10, at p. 127, ll. 7-9.

104.    Dr. Edward Steinfeld has never dealt with the New York City Department of Transportation.  *See* Badway Decl., Exhibit 10, at p. 44, ll. 8-13.

14

105.    Dr. Edward Steinfeld has never applied for a permit from the New York City Department of Transportation.  *See* Badway Decl., Exhibit 10, at p. 44, ll. 8-13.

106.    Dr. Edward Steinfeld has never dealt with the New York City Department of Buildings.  *See* Badway Decl., Exhibit 10, at p. 44, ll. 14-16.

107.    As such, Dr. Edward Steinfeld has never filed a permit with the New York City Department of Buildings.  *See* Badway Decl., Exhibit 10, at p. 44, ll. 14-16.

108.    Dr. Edward Steinfeld does not have any knowledge of the New York City laws, rules, and regulations that affect Defendants' ability to carry out the Proposal.  *See* Badway Decl., Exhibit 10, at p. 44, ll. 17-21.

109.    Dr. Edward Steinfeld does not have knowledge of the requirements of the New York City Building Code.  *See* Badway Decl., Exhibit 10, at p. 72, ll. 7-15.

110.    Dr. Edward Steinfeld has not opined whether the Proposal complies with any local laws, codes, standards, or regulations.  *See* Badway Decl., Exhibit 10, at p. 72, ll. 16-25; *see also* Badway Decl., Exhibit 5.

111.    Dr. Edward Steinfeld does not know if the Proposal complies with the requirements of the New York City Department of Buildings.  *See* Badway Decl., Exhibit 10, at p. 130, ll. 4-10.

112.    Dr. Edward Steinfeld does not know if the Proposal would be approved by the New York City Department of Buildings.  *See* Badway Decl., Exhibit 10, at p. 73, ll. 8-11.

113.    Dr. Edward Steinfeld does not know if the Proposal complies with the requirements of the New York City Department of Transportation.  *See* Badway Decl., Exhibit 10, at p. 73, ll. 12-15, and at pp. 127-28, ll. 10-22.

114.     Dr. Edward Steinfeld does not know if the Proposal would be approved by the New York City Department of Transportation.  *See* Badway Decl., Exhibit 10, at p. 130, ll. 4-10.

115.     Plaintiff has not submitted any cost estimate for the Proposal or for any recommendations made in Plaintiff's Expert Report.  *See* Badway Decl., Exhibit 10, at p. 130-31, ll. 17-11.; *see also* Badway Decl., Exhibits 5, 6, and 8.

116.     The Landlord does not own the sidewalk abutting the Building and the Subject Premises.  *See* Weiss Decl., at ¶ 7; Kaye Decl., at ¶ 6.

117.     The Landlord does not have the authority to build the Ramp System or any other structure on the sidewalk in front of the Subject Premises absent the approval of certain regulatory bodies.  *See* Weiss Decl., at ¶ 9; Kaye Decl., at ¶ 8.

118.     Defendants have not modified the Step or the sidewalk in front of the Subject Premises.  *See* Holzman Decl., at ¶ 7; Weiss Decl., at ¶¶ 6, 8; Kaye Decl., at ¶¶ 5, 7.

119.     The Meatball Shop has implemented policies and procedures, including a document entitled "Accessibility Guide for Shops," in furtherance of its commitment to providing equal access for all of its guests.  *See* Glasgow Decl., at ¶ 4 and Exhibit 1.

120.     The Meatball Shop maintains and uses a portable ramp for wheelchair users to enter and exit the Subject Premises.  *See* Glasgow Decl., at ¶ 5; Salmen Decl., at ¶ 34.

121.     The Meatball Shop has maintained and used a portable ramp for wheelchair users to enter and exit the Subject Premises since prior to the commencement of the Action.  *See* Glasgow Decl., at ¶ 5 and Exhibit 2.

122.     On October 23, 2017, The Meatball Shop purchased a new portable ramp ("Portable Ramp") that it currently uses.  *See* Badway Decl., Exhibit 7; Glasgow Decl., at ¶¶ 5-6; Salmen, Decl., at ¶ 34.

16

123.    Plaintiff submitted a supplemental report regarding the Portable Ramp that is dated January 31, 2018 ("Plaintiff's Supplemental Expert Report").  *See* Badway Decl., Exhibit 8.

124.    Defendants submitted a supplemental rebuttal report regarding the Portable Ramp that is dated March 15, 2018 ("Defendants' Supplemental Expert Report").  *See* Badway Decl., Exhibit 9.[2]

125.    On the exterior of the Building, there is a doorbell designated with the International Symbol of Accessibility and the text "PLEASE RING BELL FOR ASSISTANCE" (collectively, "Doorbell and Signage").  *See* Glasgow Decl., at ¶ 7; Salmen Decl., at ¶ 35.

126.    The Doorbell and Signage are located adjacent to the Retail Entrance.  *See* Glasgow Decl., at ¶ 8; Salmen Decl., at ¶ 35.

127.    The purpose of the Doorbell and Signage is to facilitate access to the Subject Premises by persons with disabilities through the deployment of the Portable Ramp and staff assistance.  *See* Glasgow Decl., at ¶ 9.

128.    The Meatball Shop's front-of-house employees monitor the Retail Entrance.  *See* Glasgow Decl., at ¶ 10.

129.    If a person in a wheelchair indicates that he or she wishes to enter the Subject Premises, either through visual cues or by ringing the Doorbell, an employee of The Meatball Shop immediately opens the door to the Retail Entrance, which opens outward and locks it in an open position.  *See* Glasgow Decl., at ¶ 11; Badway Decl., Exhibit 9; Salmen Decl., at ¶ 36.

---

[2] All references to Badway Decl., Exhibit 9 shall be construed also to refer to Salmen Decl., Exhibit C, as the exhibits are the same document.

Active\102413471.v6

130.    The door to the Retail Entrance locks in an open position, as there is a hook on the exterior wall and an eye at the bottom of the outside of the door.  *See* Glasgow Decl., at ¶ 11; Salmen Decl., at ¶ 36.

131.    After locking the door to the Retail Entrance in an open position, The Meatball Shop employee retrieves and deploys the Portable Ramp.  *See* Glasgow Decl., at ¶ 12; Salmen Decl., at ¶ 36.

132.    The Meatball Shop employee places the Portable Ramp on the sidewalk and over the lip of the Step at the Retail Entrance.  *See* Glasgow Decl., at ¶ 12; Salmen Decl., at ¶ 36.

133.    The Meatball Shop employee then provides whatever assistance the patron in the wheelchair requests and/or needs to allow him or her to ascend the Portable Ramp, and then enter the Subject Premises.  *See* Glasgow Decl., at ¶ 13.

134.    Only one employee of The Meatball Shop is needed to retrieve and deploy the portable ramp.  However, sometimes more than one employee will assist if available.  *See* Glasgow Decl., at ¶ 14; Salmen Decl., at ¶ 36.

135.    After the wheelchair-using patron enters the Subject Premises and is safely clear of the Portable Ramp, The Meatball Shop employee recovers the Portable Ramp, brings it inside the Subject Premises for storage, and closes the door to the Retail Entrance.  *See* Glasgow Decl., at ¶ 15; Salmen Decl., at ¶ 36.

136.    After the wheelchair-using patron has concluded his or her dining experience at the Subject Premises, an employee of The Meatball Shop opens the door to the Retail Entrance, locks the door in an open position, retrieves the Portable Ramp, and deploys the Portable Ramp. *See* Glasgow Decl., at ¶ 16.

Active\102413471.v6

137.    The Meatball Shop employee then assists the wheelchair-using patron through the Retail Entrance and down the ramp, as needed.  *See* Glasgow Decl., at ¶ 16.

138.    After the wheelchair-using patron is safely clear of the Portable Ramp, The Meatball Shop employee recovers the Portable Ramp, brings it inside the Subject Premises for storage, and closes the door to the Retail Entrance.  *See* Glasgow Decl., at ¶ 17; Salmen Decl., at ¶ 36.

139.    The Portable Ramp is 3' wide by 8' long.  *See* Badway Decl., Exhibit 7; Salmen Decl., at ¶ 37.

140.    The Portable Ramp is composed of two hinged sections that each fold in half.  *See* Badway Decl., Exhibit 9; Salmen Decl., at ¶ 37.

141.    The overall rise of the Portable Ramp from bottom to top is greater than the height of the Step because the existing sidewalk slopes away from the Building toward the street at a slope of approximately 4%.  *See* Badway Decl., Exhibit 9; Salmen Decl., at ¶ 37.

142.    The running slope at the top section of the Portable Ramp is 9.4%.  *See* Badway Decl., Exhibit 9; Salmen Decl., at ¶ 37.

143.    The running slope at the bottom section of the Portable Ramp is 13.6%.  *See* Badway Decl., Exhibit 9; Salmen Decl., at ¶ 37.

144.    There is space at the bottom of the Portable Ramp for pedestrians to navigate past the Portable Ramp and for wheelchair users to navigate onto the Portable Ramp.  *See* Badway Decl., Exhibit 9; Salmen Decl., at ¶ 38.

145.    A width of 36-½ inches is provided at the bottom of the Portable Ramp to the edge of the sidewalk pavers bordering the planting boulevard that is a distance of 50 inches from the edge of the street curb.  *See* Badway Decl., Exhibit 9; Salmen Decl., at ¶ 38.

19

146.    Given the width of 36-½ inches that is provided at the bottom of the Portable Ramp to the edge of the sidewalk pavers bordering the planting boulevard that is a distance of 50 inches from the edge of the street curb, the Portable Ramp is the maximum length portable ramp that is possible for use at the Subject Premises.  *See* Badway Decl., Exhibit 9.

147.    A hinged flap at the top of the Portable Ramp rises at total of ½ inch above the Step, with the edge of the flap presenting a ¼ inch high maximum abrupt vertical level change from the surface of the Step.  *See* Badway Decl., Exhibit 9; Salmen Decl., at ¶ 39.

148.    The hinged flap at the top of the Portable Ramp is 2-3/4 inches in length.  *See* Badway Decl., Exhibit 9; Salmen Decl., at ¶ 39.

149.    More than 5% of the dining positions within the Subject Premises are accessible.  *See* Badway Decl., Exhibits 5 and 7; Salmen Decl., at ¶ 40.

150.    Both Plaintiff's expert, Dr. Edward Steinfeld, and Defendants' expert, John Salmen, agree that Defendants are in compliance with their obligations under the ADA with respect to the Restaurant's seating if the 1991 Standards apply.  *See* Badway Decl., Exhibits 5, 7, and 10, at pp. 75-76, ll. 1-10; Salmen Decl., at ¶ 40.

151.    There is accessible seating near the bar.  *See* Badway Decl., Exhibit 10, at p. 76, ll. 2-7.

152.    The same service and menu is provided at all seating in the Restaurant, including at tables in the bar area and at the bar counter.  *See* Badway Decl., Exhibit 7; Glasgow Decl., at ¶ 18.

153.    The restaurant has a service counter with a cash register.  *See* Badway Decl., Exhibit 7; Salmen Decl., at ¶ 42; Glasgow Decl., at ¶ 19.

Active\102413471.v6

154.    The restaurant's service counter with a cash register is not used by The Meatball Shop's guests; it is an employee workstation for employee use.  *See* Badway Decl., Exhibit 7; Salmen Decl., at ¶ 42; Glasgow Decl., at ¶ 20.

155.    There are no transactions undertaken or completed by guests at the restaurant's service counter with a cash register.  *See* Badway Decl., Exhibit 7; Salmen Decl., at ¶ 42; Glasgow Decl., at ¶ 21.

156.    The Meatball Shop's policy is to offer tableside service for guests to complete all transactions, including paying their checks.  *See* Badway Decl., Exhibit 7; Salmen Decl., at ¶ 42; Glasgow Decl., at ¶ 22.

157.    There is a cane-detectable element below the service counter.  *See* Declaration of Adam Rosenbaum, dated October 18, 2019 ("Rosenbaum Decl."), at ¶¶ 18-19 and Exhibit 6; Salmen Decl., at ¶ 43.

158.    The cane-detectable element below the service counter is located directly on the finished floor.  *See* Rosenbaum Decl., at ¶¶ 18-19 and Exhibit 6; Salmen Decl., at ¶ 44.

159.    The cane-detectable element below the service counter extends 11-3/4 inches above the finished floor and extends 8-1/8 inches from the face of the wall beneath the service counter.  *See* Rosenbaum Decl., at ¶¶ 18-19 and Exhibit 6; Salmen Decl., at ¶ 44.

160.    The cane-detectable element below the service counter presents a detectable element within 4 inches horizontally of all parts of the protruding counter.  *See* Rosenbaum Decl., at ¶¶ 18-19 and Exhibit 6; Salmen Decl., at ¶ 44.

161.    There are two single-user toilet rooms at the Subject Premises.  *See* Badway Decl., Exhibit 7; Salmen Decl., at ¶ 46; Glasgow Decl., at ¶ 23.

Active\102413471.v6

162.    The two single-user toilet rooms are directly across the hallway from each other at the rear of the Subject Premises.  *See* Badway Decl., Exhibit 7; Salmen Decl., at ¶ 46.

163.    One of the two single user toilet rooms at the Subject Premises has been designated as an accessible toilet room ("Accessible Toilet Room").  *See* Badway Decl., Exhibit 7; Salmen Decl., at ¶ 46; Glasgow Decl., at ¶ 23.

164.    In the Accessible Toilet Room, the water closet is located in a space that has 36 inches between the side wall and the lavatory.  *See* Badway Decl., Exhibit 7; Salmen Decl., at ¶ 47.

165.    The lavatory is within the toilet clearance overlap in the Accessible Toilet Room.  *See* Badway Decl., Exhibits 5 and 7; Salmen Decl., at ¶ 47.

166.    In the Accessible Toilet Room, the knee and toe clearance at the lavatory is 30-1/2 inches wide and more than 48 inches deep for a forward approach.  *See* Badway Decl., Exhibit 7; Salmen Decl., at ¶ 47.

167.    In the Accessible Toilet Room, at a height of 27 inches above the finished floor, the knee clearance under the lavatory is 9 inches deep, as measured from the front edge of the lavatory to the face of the pipe shroud.  *See* Badway Decl., Exhibit 7; Salmen Decl., at ¶ 47.

168.    There currently is no cabinet within the Accessible Toilet Room.  *See* Badway Decl., Exhibit 7; Salmen Decl., at ¶ 48; Glasgow Decl., at ¶ 24.

169.    The Meatball Shop does not intend to have any cabinet within the Accessible Toilet Room in the future.  *See* Glasgow Decl., at ¶ 24.

170.    The Meatball Shop is committed to ensuring that there is no cabinet within the Accessible Toilet Room to ensure sufficient clear floor space for persons using wheelchairs.  *See* Glasgow Decl., at ¶ 24.

Active\102413471.v6

171.     There is a movable waste basket in the Accessible Toilet Room.  *See* Badway Decl., Exhibits 5, 7, and 10, at p. 90, ll. 14-16; Salmen Decl., at ¶ 49.

172.     In the Accessible Toilet Room, the movable waste basket is located beside the lavatory such that it allows 31 inches wide knee and toe clearance under the lavatory.  *See* Badway Decl., Exhibits 7 and 10, at pp. 91-92, ll. 16-20; Salmen Decl., at ¶ 49.

173.     In the Accessible Toilet Room, the front of the water closet is located 18-1/2 inches from the sidewall and the back of the water closet is located 18-1/8 inches from the side wall.  *See* Badway Decl., Exhibit 7; Salmen Decl., at ¶ 50.

174.     In 2017, the rear wall grab bar in the Accessible Toilet Room was 28 inches in length.  *See* Badway Decl., Exhibits 5 and 7; Salmen Decl., at ¶ 52.

175.     In 2017, the rear wall grab bar in the Accessible Toilet Room was 37-1/2 inches above the finished floor, as measured to the top of the gripping surface of the grab bar.  *See* Badway Decl., Exhibits 5 and 7; Salmen Decl., at ¶ 52.

176.     In 2017, the rear wall grab bar in the Accessible Toilet Room was 36-5/8 inches above the finished floor, as measured to the centerline of the grab bar.  *See* Badway Decl., Exhibits 5 and 7; Salmen Decl., at ¶ 52.

177.     In 2017, the diameter of the rear wall grab bar in the Accessible Toilet Room was 1-3/4 inches in length.  *See* Badway Decl., Exhibits 5 and 7; Salmen Decl., at ¶ 52.

178.     Currently, the rear wall grab bar in the Accessible Toilet Room is 30 inches in length, has a diameter of 1-1/4 inches, and is located 36 inches above the finished floor as measured top of the gripping surface.  *See* Rosenbaum Decl., at ¶¶ 7-8, 11 and Exhibit 3; Salmen Decl., at ¶¶ 53-54.

Active\102413471.v6

179.    Currently, the space between the rear wall in the Accessible Toilet Room and the rear wall grab bar is 1-1/2 inches.  *See* Rosenbaum Decl., at ¶¶ 9, 11 and Exhibit 3; Salmen Decl., at ¶¶ 53-54.

180.    Due to the geometry of the space, a 36-inch grab bar will not fit in the space between the toilet side wall and the lavatory in the Accessible Toilet Room.  *See* Badway Decl., Exhibits 5, 7, and 10, at pp. 96-97, at ll. 15-2; Rosenbaum Decl., at ¶¶ 10-11 and Exhibit 3; Salmen Decl., at ¶ 55.

181.    The rear wall grab bar in the Accessible Toilet Room is the longest grab bar that can be installed.  *See* Rosenbaum Decl., at ¶¶ 10-11 and Exhibit 3; Salmen Decl., at ¶ 55.

182.    In 2017, the side wall grab bar in the Accessible Toilet Room extended 52 inches in length from the rear wall.  *See* Badway Decl., Exhibits 5 and 7; Salmen Decl., at ¶ 56.

183.    In 2017, the side wall grab bar in the Accessible Toilet Room was 36-5/8 inches above the finished floor, as measured to the centerline of the grab bars.  *See* Badway Decl., Exhibits 5 and 7; Salmen Decl., at ¶ 57.

184.    In 2017, the side wall grab bar in the Accessible Toilet Room was 36-5/8 inches above the finished floor, as measured to the centerline of the grab bar.  *See* Badway Decl., Exhibits 5 and 7; Salmen Decl., at ¶ 57.

185.    In 2017, the diameter of the side wall grab bar in the Accessible Toilet Room was 1-3/4 inches in length.  *See* Badway Decl., Exhibits 5 and 7; Salmen Decl., at ¶ 57.

186.    Currently, the side wall grab bar in the Accessible Toilet Room is 48 inches in length, has a diameter of 1-1/4 inches, and is located 36 inches above the finished floor as measured top of the gripping surface.  *See* Rosenbaum Decl., at ¶¶ 7, 12, 15 and Exhibit 4; Salmen Decl., at ¶¶ 58-59.

187.    Currently, the side wall grab bar in the Accessible Toilet Room is located approximately 6 inches from the rear wall and extends to a distance of over 54 inches from the rear wall.  *See* Rosenbaum Decl., at ¶¶ 7, 14, 15 and Exhibit 4; Salmen Decl., at ¶¶ 58-59.

188.    Currently, the space between the side wall in the Accessible Toilet Room and the side wall grab bar is 1-1/2 inches.  *See* Rosenbaum Decl., at ¶¶ 7, 13, 15 and Exhibit 4; Salmen Decl., at ¶¶ 58-59.

189.    In the Accessible Toilet Room, the toilet paper dispenser is centered 8-7/8 inches in front of the water closet.  *See* Badway Decl., Exhibit 7; Salmen Decl., at ¶ 51.

190.    The Meatball Shop currently does not store any excess toilet paper rolls in the Accessible Toilet Room.  *See* Badway Decl., Exhibit 7; Salmen Decl., at ¶ 51; Glasgow Decl., at ¶ 25.

191.    The Meatball Shop does not intend to store any excess toilet paper rolls in the Accessible Toilet Room in the future.  *See* Glasgow Decl., at ¶ 25.

192.    The Meatball Shop is committed to ensuring that no excess toilet paper rolls are stored in the Accessible Toilet Room.  *See* Glasgow Decl., at ¶ 25.

193.    A full-length mirror is located on the back of the door in the Accessible Toilet Room.  *See* Badway Decl., Exhibit 7; Salmen Decl., at ¶ 60.

194.    In the Accessible Toilet Room, the bottom edge of the full-length mirror's reflecting surface is 18 inches above the finished floor.  *See* Badway Decl., Exhibit 7; Salmen Decl., at ¶ 60.

195.    A coat hook is located at approximately 39 inches above the finished floor in the Accessible Toilet Room.  *See* Badway Decl., Exhibit 7; Salmen Decl., at ¶ 61.

Active\102413471.v6

196.    In 2017, the height of the Accessible Toilet Room door threshold was 9/16 of an inch on the Accessible Toilet Room side of the door threshold.  *See* Badway Decl., Exhibits 5 and 7; Salmen Decl., at ¶ 62.

197.    Dr. Edward Steinfeld and John Salmen agree that 1/16 of an inch is a reasonable construction tolerance for the Accessible Toilet Room door threshold.  *See* Badway Decl., Exhibit 10, at p. 113, at ll. 21-25; Salmen Decl., at ¶ 62.

198.    Currently, the height of the abrupt portion of the Accessible Toilet Room door threshold is less than 1/4 of an inch on the Accessible Toilet Room side of the door threshold. *See* Rosenbaum Decl., at ¶¶ 5-6 and Exhibit 2; Salmen Decl., at ¶ 63.

199.    Currently, the remaining height of the Accessible Toilet room door threshold on the inside of the Accessible Toilet Room side of the door threshold is approximately 1/2 of an inch and is beveled over a distance of 2-1/4 inches.  *See* Rosenbaum Decl., at ¶¶ 5-6 and Exhibit 2; Salmen Decl., at ¶ 63.

200.    Currently, there is a sign displaying the International Symbol of Accessibility at the Accessible Toilet Room ("ISA Sign").  *See* Rosenbaum Decl., at ¶¶ 2, 4 and Exhibit 1; Salmen Decl., at ¶ 64.

201.    The ISA Sign supplements existing signage with high contrast, raised character and braille.  *See* Rosenbaum Decl., at ¶¶ 3, 4 and Exhibit 1; Salmen Decl., at ¶ 64.

202.    The ISA Sign is on a pictogram field that is 6 inches in height.  *See* Rosenbaum Decl., at ¶¶ 2, 4 and Exhibit 1; Salmen Decl., at ¶ 65.

203.    The baseline of the lowest tactile character of the existing signage is 49-1/2 inches above the finished floor.  *See* Rosenbaum Decl., at ¶¶ 3, 4 and Exhibit 1; Salmen Decl., at ¶ 65.

26

204.     There is a cane-detectable element below the hand-drying equipment in the Accessible Toilet Room.  *See* Rosenbaum Decl., at ¶¶ 16-17 and Exhibit 5; Salmen Decl., at ¶ 66.

205.     The cane-detectable element below the hand-drying equipment in the Accessible Toilet Room is located approximately 10 inches above the finished floor.  *See* Rosenbaum Decl., at ¶¶ 16-17 and Exhibit 5; Salmen Decl., at ¶ 67.

206.     The cane-detectable element below the hand-drying equipment in the Accessible Toilet Room extends 3-1/4 inches from the wall.  *See* Rosenbaum Decl., at ¶¶ 16-17 and Exhibit 5; Salmen Decl., at ¶ 67.

207.     The cane-detectable element below the hand-drying equipment in the Accessible Toilet Room presents a detectable element within 4 inches horizontally of all parts of the protruding hand dryer.  *See* Rosenbaum Decl., at ¶¶ 16-17 and Exhibit 5; Salmen Decl., at ¶ 67.

208.     Aside from Plaintiff's Complaint in this Action, The Meatball Shop has not received any complaint—formal or informal—alleging any discrimination at the Restaurant or issues regarding the Restaurant's accessibility, including the use of the Portable Ramp at the Restaurant's entrance  *See* Glasgow Decl., at ¶ 28.

27

209.    Persons with physical disabilities, including persons in wheelchairs, have accessed the Restaurant, have had a full and equal opportunity to participate in and enjoy the Restaurant, and have benefited from the goods and services of the Restaurant.  *See* Glasgow Decl., at ¶ 2.

Respectfully submitted:

Dated: New York, New York          FOX ROTHSCHILD LLP
          October 18, 2019

By: */s/ Ernest Edward Badway*
      Carolyn D. Richmond
      Ernest Edward Badway
      Jason B. Jendrewski
      101 Park Avenue, Suite 1700
      New York, New York 10178
      Telephone: (212) 878-7900
      Facsimile: (212) 692-0940
      *Attorneys for Defendants 172nd LLC, 170 Too*
      *Bedford, LLC, and 170 Bedford Restaurant,*
      *LLC*

28