**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

DAN GROPPER,

       Plaintiff,

– against –

172ND LLC, 170 TOO BEDFORD, LLC AND
170 BEDFORD RESTAURANT LLC,

       Defendants.

**ECF Case**

**16-cv-05358 (RML)**

---

### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

**FOX ROTHSCHILD LLP**
101 Park Avenue, Suite 1700
New York, New York 10178
Telephone: (212) 878-7900
Facsimile: (212) 692-0940

*On Brief*:

Carolyn D. Richmond, Esq.
Ernest Edward Badway, Esq.
Jason B. Jendrewski, Esq.

Active\102566067.v5

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ....................................................................................1

FACTUAL BACKGROUND...........................................................................................2

      A.    ENTRANCE.......................................................................................3

      B.    DINING ROOM................................................................................10

      C.    TOILET ROOMS…………………….............................................11

      D.    RECORD OF ACCOMMODATING PERSONS WITH
             DISABILITIES…..….…………….......................................14

LEGAL ARGUMENT ..................................................................................................15

   POINT I    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT
              BECAUSE THERE IS NO GENUINE DISPUTE OF
              MATERIAL FACT ......................................................................15

   POINT II   DEFENDANTS ARE IN COMPLIANCE WITH THE
              AMERICANS WITH DISABILITIES ACT AND APPLICABLE
              STATE AND CITY LAWS.........................................................17

      A.    THE "READILY ACHIEVABLE" BARRIER REMOVAL
          STANDARD APPLIES TO THE STEP AND PLAINTIFF
          BEARS (AND FAILS TO SATISFY) THE INITIAL BURDEN
          OF PROOF…………......................................................................18

      B.    THE REMOVAL OF THE STEP IS NOT READILY
          ACHIEVABLE…….……………….......................................20

      C.    THE ENTRANCE IS ACCESSIBLE TO THE MAXIMUM
          EXTENT FEASIABLE AND ALL OTHER ELEMENTS
          COMPLY WITH THE APPLICABLE ADA STANDARDS
          FOR ACCESSIBLE DESIGN……………….................................21

          a.    Entrance……………………..….………….................23

          b.    Dining Room.................................................................25

          c.    Toilet Rooms…..…...................................................26

i

POINT III   PLAINTIFF'S NEGLIGENCE CLAIM FAILS AS A MATTER
            OF LAW ................................................................................................27

POINT IV   PLAINTIFF IS NOT ENTITLED TO RECOVER ATTORNEYS' FEES
            BECAUSE PLAINTIFF'S CLAIMS ARE MERITLESS AND/OR
            MOOT………..……………………………………………………27

POINT V    THE COURT SHOULD DECLINE JURISDICTION OVER
            THE STATE AND CITY LAW CLAIMS IF ANY OF THOSE
            CLAIMS SURVIVE SUMMARY JUDGMENT ......................................27

CONCLUSION.........................................................................................................................30

Active\102566067.v5

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Cases**

*All State Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.*,
    473 F.3d 450 (2d Cir. 2007) ...............................................................16

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ................................................................. 15, 16

*Ashton v. Pall Corp.*,
    32 F. Supp. 2d 82 (E.D.N.Y. 1999).......................................................17

*Bacon v. Walgreen Co.*,
    No. 14–CV–419 (JFB)(ARL), 2015 WL 1261408 (E.D.N.Y. Mar. 20, 2015).......................29

*Borkowski v. Valley Cent. Sch. Dist.*,
    63 F.3d 131 (2d Cir. 1995) ...............................................................19

*Bouboulis v. Transport Workers Union of Am.*,
    442 F.3d 55 (2d Cir. 2006) ...............................................................16

*Buckhannon Bd. and Care Home, Inc. v. West Virginia Dept. of Health and Human Res.*,
    532 U.S. 598 (2001) .....................................................................28

*Camarillo v. Carrols Corp.*,
    518 F.3d 153 (2d Cir. 2008) ...............................................................18

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) .....................................................................16

*Colorado Cross Disability Coal. v. Hermanson Family Ltd.*,
    264 F.3d 999 (10th Cir. 2001) ...............................................................20

*De La Rosa v. 597 Broadway Develop. Corp.*,
    No. 13-CV-7999 (LAK)(MHD), 2015 WL 7351540 (S.D.N.Y. Aug. 4, 2015)...............20, 25

*Di Ponzio v. Riordan*,
    679 N.E.2d 616 (N.Y. 1997) ...............................................................28

*Faruq v. Wal-Mart Stores, Inc.*,
    2006 U.S. Dist. LEXIS 4675 (W.D.N.Y. Jan. 23, 2006).......................................17

*First Nat'l Bank of Ariz. v. Cities Serv. Co.*,
    391 U.S. 253 (1968) .....................................................................16

Active\102566067.v5

*Francis v. Lo-Do Corp.*,
No. 14-CV-5422 (KBF), 2014 WL 7180091 (S.D.N.Y. Dec. 5, 2014) ...............................28

*Hartnett v. Fielding Graduate Institute*,
400 F. Supp. 2d 570 (S.D.N.Y. 2005), *aff'd in part and rev'd in part on other
grounds*, 198 Fed.Appx. 89 (2d Cir. 2006) (summary order)..................................................17

*J.C. v. Reg'l Sch. Dist. 10, Bd. of Ed.*,
278 F.3d 119 (2d Cir. 2002) ...................................................................................................29

*Jeffreys v. City of New York*,
426 F.3d 549 (2d Cir. 2005) ...................................................................................................16

*Kreisler v. Second Avenue Diner Corp.*,
No. 10 Civ. 7582 (RJS), 2012 WL 3961304 (S.D.N.Y. Sept. 11, 2012), *aff'd*,
731 F.3d 184 (2d Cir. 2013) .............................................................................................19, 26

*Lockhart v. Coreas*,
No. 10–CV–1644 (SJF)(ETB), 2011 WL 2516569 (E.D.N.Y. June 21, 2011).....................29

*Marradi v. Galway House, Inc.*,
No. 13-10813 (RGS), 2014 WL 1454266 (D. Mass. Apr. 15, 2014) ...............................18

*Marvel Characters, Inc. v. Simon*,
310 F.3d 280 (2d Cir. 2002) ...................................................................................................17

*Matsushita Elec. Indus. Co. v. Zenit Radio Corp.*,
475 U.S. 574 (1986) ................................................................................................................16

*McClellan v. Smith*,
439 F.3d 137 (2d Cir. 2006) ...................................................................................................16

*Panzica v. Mas-Maz, Inc.*,
No. CV 05-2595 (ARL), 2007 WL 1732123 (E.D.N.Y. June 11, 2007) ............. 16, 17, 19, 29

*Pascuiti v. New York Yankees*,
No. 98 Civ. 8186 (SAS), 1999 WL 1102748 (S.D.N.Y. Dec. 6, 1999) .................................19

*Pinto v. Allstate Inc. Co.*,
221 F.3d 394 (2d Cir. 2000) ...................................................................................................17

*Range v. 535 Broadway Group LLC*,
No. 17-cv-00423 (WHP), 2019 WL 4182966 (S.D.N.Y. Sept. 3, 2019) ...............................23

*Roberts v. Royal Atlantic Corp.*,
542 F.3d 363 (2d Cir. 2008) .......................................................................18, 19, 20, 21, 22

iv

*Rodriguez v. Barrita, Inc.*,
  10 F. Supp. 3d 1062 (N.D. Cal. 2014) ................................................................9

*Stan v. Wal-Mart Stores, Inc.*,
  111 F. Supp. 2d 119 (N.D.N.Y. 2000) ...............................................................29

*Stuart v. American Cyanamid Co.*,
  158 F.3d 622 (2d Cir. 1998) ...............................................................................16

*Thomas v. Ariel West*,
  242 F.Supp.3d 293 (S.D.N.Y. March 15, 2017) ................................................28

*Wasco v. T Corp.*,
  No. 04-0088 (JR), 2008 WL 53707 (D.D.C. Jan. 3, 2008) ................................20

*Williams v. Utica Coll. of Syracuse Univ.*,
  453 F.3d 112 (2d Cir. 2006) ...............................................................................16

*Ying Jing Gan v. City of New York*,
  996 F.2d 522 (2d Cir. 1993) ...............................................................................16

**Statutes**

28 U.S.C. § 1367(c)(3) ...............................................................................................29

42 U.S.C. § 12181(9) .................................................................................................20

42 U.S.C. § 12182(a) ..................................................................................................18

42 U.S.C. § 12182(b) ..................................................................................................18

42 U.S.C. § 12182(b)(2)(A)(iv) ...........................................................................18, 19

42 U.S.C. § 12183(a)(2) .............................................................................................18

Administrative Code of the City of New York § 8-107 ................................................1

Federal Rule of Civil Procedure 56(a) ......................................................................15

New York State Civil Rights Law § 40 .........................................................................1

New York State Executive Law § 296 ...........................................................................1

Title III of Americans with Disabilities Act ................................................................1

**Other Authorities**

1991 ADA Standards for Accessible Design, Section 4.16.2 and Fig. 28 ..................27

Active\102566067.v5

2010 ADA Standards for Accessible Design, Section 106.5 ......................................................24

2010 ADA Standards for Accessible Design, Section 202.3, Exception 2 ..................................24

2010 ADA Standards for Accessible Design, Section 203.9 ......................................................26

2010 ADA Standards for Accessible Design, Section 213.2, Exception 4 ..................................27

2010 ADA Standards for Accessible Design, Section 307 ........................................................26

28 C.F.R. § 36.211(c) ...............................................................................................................23

28 C.F.R. § 36.304(d)(2) ..........................................................................................................23

28 C.F.R. § 36.304(e) ...............................................................................................................21

28 C.F.R. § 36.402(a)(1) ..........................................................................................................22

28 C.F.R. § 36.402(b)(1) ..........................................................................................................22

28 C.F.R. § 36.402(c) ..........................................................................................................21, 22

28 C.F.R. § 36.406(a)(2) ..........................................................................................................23

28 C.F.R. § 36.406(a)(5)(ii) ......................................................................................................23

ADA Title III Technical Assistance Manual § III-4.4200 ........................................................20

## PRELIMINARY STATEMENT

Defendants 172nd LLC, 170 Too Bedford, LLC, and 170 Bedford Restaurant LLC ("The Meatball Shop") (collectively, "Defendants") submit this Memorandum of Law in Support of their Motion for Summary Judgment ("Motion"), pursuant to Rule 56 of the Federal Rules of Civil Procedure ("FRCP"), this Court's Order, dated August 1, 2019, and Defendants' letter motion, dated October 4, 2019 (D.E. 39).

Plaintiff Dan Gropper ("Plaintiff") is a wheelchair user who alleges that The Meatball Shop ("Restaurant"), a restaurant located at 170 Bedford Avenue, Brooklyn, New York, is not accessible to persons with disabilities. In the Complaint, filed on September 27, 2016, Plaintiff alleges that unlawful barriers to access at the Restaurant include: (1) an inaccessible public entrance due to a step at the exterior side of the entrance door; (2) inaccessible seating at the bar and in the dining area; (3) and inaccessible toilet rooms. *See* Declaration of Ernest Edward Badway, dated October 4, 2019 ("Badway Decl."), Exhibit 3, at ¶ 24.

Based on these purported barriers to access, Plaintiff claims that he was discriminated against in the use of a public accommodation in violation of: (1) Title III of the Americans with Disabilities Act ("ADA"); (2) New York State Executive Law § 296 ("New York State Human Rights Law"); (3) Administrative Code of the City of New York § 8-107 ("New York City Human Rights Law"); and (4) New York State Civil Rights Law § 40 ("New York State Civil Rights Law"). *See* Badway Decl., Exhibit 3. Plaintiff also asserts a claim for negligence. *See id.* Plaintiff seeks injunctive, declaratory, and monetary relief, including compensatory damages, punitive damages, civil penalties, and attorneys' fees, costs and expenses. *See id.*

This action is not an ADA case where Plaintiff is unable enjoy the services, benefits, and privileges of a public accommodation. Here, Plaintiff can enter the Restaurant (there is an ADA-accessible means of entry), Plaintiff can dine at the Restaurant (there are ADA-accessible seating

1

positions), and Plaintiff can use the restroom (there is an ADA-accessible toilet room).

Accordingly, Defendants filed their Answer on January 26, 2017, denying Plaintiff's claims and

asserting several affirmative and other defenses.  *See* Badway Decl., Exhibit 4.

      Defendants now move for summary judgment because they are in compliance with their

obligations under the ADA and applicable state and local statutes.  Accordingly, summary

judgment is proper and warranted as a matter of law.

## FACTUAL BACKGROUND

      Plaintiff is a serial litigant who filed 15 lawsuits in the United States District Courts for

the Southern and Eastern Districts of New York over a four-year period, including the case at bar

("Action").  *See* Badway Decl., at ¶ 1.  All of Plaintiff's lawsuits allege disability discrimination

in violation of the ADA and similar state and city statutes.  *See* Badway Decl., at ¶ 2.

      Defendant 172nd LLC owns the property located at 170 Bedford Avenue, Brooklyn, New

York ("Building"), having acquired the Building on October 13, 2010.  *See* Badway Decl.,

Exhibit 3, at ¶ 7; Badway Decl., Exhibit 4, at ¶ 7; Declaration of Jay Weiss, dated October 18,

2019 ("Weiss Decl."), at ¶¶ 1, 4.  Defendant 170 Too Bedford, LLC leases certain property at the

Building from defendant 172nd LLC.[1]  *See* Declaration of Michael Kaye, dated October 18,

2019 ("Kaye Decl."), at ¶ 1.  The Meatball Shop subleases a portion of the Building from

defendant 170 Too Bedford, LLC.  *See* Badway Decl., Exhibit 3, at ¶ 9; Kaye Decl., at ¶ 1;

Declaration of Daniel Holzman, dated October 3, 2019 ("Holzman Decl."), at ¶ 2 and Exhibit 1.

      The Building was erected prior to 1901—more than 89 years before the enactment of the

ADA—and has a cellar and four floors of commercial and residential space.  *See* Weiss Decl., at

¶¶ 2-3 and Exhibit 1; Kaye Decl., at ¶¶ 2-3 and Exhibit 1; Holzman Decl., Exhibit 1.  On

November 1, 2010, The Meatball Shop leased the first floor store area of the Building, excluding

---

[1]170 Too Bedford, LLC and 172nd LLC collectively shall be referred to as the "Landlord."

the residential hallway and stair ("Subject Premises").  *See* Holzman Decl., at ¶¶ 2-3 and Exhibit 1.  Defendants subsequently engaged Richard H. Lewis Architect and modified the Subject Premises to create the Restaurant.  *See* Holzman Decl., at ¶¶ 6, 8 and Exhibit 2.  The Restaurant opened in July 2011 after the modifications were completed.  *See* Holzman Decl., at ¶¶ 9-10 and Exhibit 2.

### A.    ENTRANCE

There is one public entry and entrance door to the Subject Premises located on Bedford Avenue ("Retail Entrance").[2]  *See* Badway Decl., Exhibits 5, 6, and 7; Holzman Decl., at ¶ 5; Declaration of John Salmen, dated October 17, 2019 ("Salmen Decl."), at ¶ 15.  On the left side of the Retail Entrance (when facing the Building), there is a cellar hatch in the sidewalk that provides access to the basement of the Subject Premises ("Cellar Hatch") and is an emergency egress route from the basement.  *See* Badway Decl., Exhibits 6, 7, and 10, at p. 122, ll. 16-25; Salmen Decl., at ¶¶ 15, 18.  On the right side of the Retail Entrance (when facing the Building), there is a separate entrance next to the Subject Premises that provides access to residential apartments above the Subject Premises ("Residential Entrance").[3]  *See* Badway Decl., Exhibit 7; Salmen Decl., at ¶ 15; Holzman Decl., at ¶ 4.  There is a distance of 5'-6" between the Retail Entrance and the Residential Entrance, and a fire sprinkler connection protrudes from the face of the Building into the area above the sidewalk.  *See* Badway Decl., Exhibits 6 and 7; Salmen Decl., at ¶¶ 16, 33.

The Retail Entrance is recessed from the face of the Building by 1'-5" and has one step that is 7 inches above the public sidewalk ("Step").  *See* Badway Decl., Exhibit 7; Salmen Decl.,

---

[2] The storefront had only one entrance to the Subject Premises at the time that The Meatball Shop entered into a lease agreement for the Subject Premises.  *See* Holzman Decl., at ¶ 5.

[3] The Residential Entrance is not part of the Subject Premises.  *See* Holzman Decl., Exhibit 1.

at ¶ 17.  The Step appears to have been part of the original construction of the Building and, at the very least, existed before 172nd LLC acquired the Building and The Meatball Shop took possession of the Subject Premises.  *See* Weiss Decl., at ¶ 5; Kaye Decl., at ¶ 4; Holzman Decl., at ¶ 5; Salmen Decl, at ¶ 17.  Defendants have not modified the Step or the sidewalk in front of the Subject Premises.  *See* Holzman Decl., at ¶ 7; Weiss Decl., at ¶¶ 6, 8; Kaye Decl., at ¶¶ 5, 7.

In 2015, prior to the commencement of the Action, The Meatball Shop investigated the feasibility of constructing a permanent ramp at the Retail Entrance.  *See* Holzman Decl., at ¶ 11 and Exhibits 3 and 4.  The Meatball Shop ultimately did not construct a permanent ramp because its architect advised that it was not possible to construct a ramp with an ADA-compliant slope and railings due to the Residential Entrance, and the ramp would block an existing fire sprinkler connection in violation of the New York City Fire Code.  *See* Holzman Decl., at ¶ 12 and Exhibit 4; *see also* Badway, Decl., Exhibit 6, Salmen Decl., at ¶ 33.

Constructing a permanent ramp at the Retail Entrance would involve modifications or alterations to the exterior of the Building and the public sidewalk in front of the Building, requiring the approval of the New York City Department of Buildings ("DOB") and the New York City Department of Transportation ("DOT").  *See* Salmen Decl., at ¶ 20.  Defendants do not own the sidewalk abutting the Building or otherwise have the authority to build a permanent ramp or any other structure on the sidewalk absent regulatory approval. *See* Weiss Decl., at ¶¶ 7, 9; Kaye Decl., at ¶¶ 6, 8.

In this Action, Plaintiff submitted an expert report, dated August 27, 2017 ("Plaintiff's Expert Report"), and an architectural plan for the alteration of the Retail Entrance that contains a

design for the construction of a permanent ramp at the Retail Entrance ("Proposal").[4]  *See*

Badway Decl., Exhibits 5 and 6; Salmen Decl., at ¶ 19.  Plaintiff identified Dr. Edward Steinfeld

as his sole expert witness in this Action, although Dr. Steinfeld never visited the Subject

Premises, did not conduct an inspection of the Subject Premises, did not take any measurements

of the Subject Premises, did not take any photographs of the Subject Premises, did not review

any construction documents before finalizing Plaintiff's Expert Report, and did not draft the

Proposal.[5]  *See* Badway Decl., Exhibits 5, 6, and 10, at pp. 59-60, ll. 25-6, 13-16, at pp. 61-62, ll.

23-15, and at p. 73, ll. 16-17.

    Plaintiff has not submitted any designs or proposals for removing the alleged barrier

posed by the Step, except for the Proposal, and has not submitted any cost estimate for the

Proposal.  *See* Badway Decl., Exhibit 10, at p. 73, ll. 20-25, at p. 119, ll. 19-25, and at pp. 130-

31, ll. 17-11; *see also* Badway Decl., Exhibits 5, 6, and 8.  The Proposal includes the

construction of a top landing at the Retail Entrance, a ramp parallel to the Building's storefront,

and a bottom landing directly in front of the Residential Entrance (collectively, "Ramp

System").[6]  *See* Badway Decl., Exhibit 6; Salmen Decl., at ¶ 19.  The Proposal shows that:

---

[4] Plaintiff's Expert Report and the Proposal were drafted by Jonathan White, not Plaintiff's
designated expert, Dr. Edward Steinfeld.  *See* Badway Decl., Exhibits 5, 6, and 10, at pp. 54-55,
ll. 23-6, 10-14, at p. 58, ll. 7-24, and at p. 73, ll. 16-19.  Plaintiff did not identify Mr. White as an
expert witness in this Action.  *See* Badway Decl., Exhibit 5.  Mr. White was an intern architect
(not licensed) when he drafted the documents.  *See* Badway Decl., Exhibit 10, at p. 55, ll. 10-14.

[5] In comparison, Defendants' expert, John Salmen, visited and inspected the Subject Premises on
four separate occasions, took measurements and photographs of the Subject Premises, observed
The Meatball Shop's operations, reviewed all documents produced by Defendants in the Action,
including architectural plans/construction drawings, and drafted his expert report, among other
things.  *See* Badway Decl., Exhibit 7; Salmen Decl., at ¶¶ 7, 9, 12.

[6] The Cellar Hatch precludes the installation of a permanent ramp to the left of the Retail
Entrance because Defendants cannot block this emergency egress route from the basement of the
Building.  *See* Badway Decl., Exhibits 6, 7, and 10, at p. 122, ll. 16-25; Salmen Decl., at ¶ 18.

5

- The Ramp System would extend 5'-5" from the face of the Building;
- The top landing would be 5' long by 5' wide;
- There would be one step between the sidewalk and the top landing;
- The bottom landing would be 5' long by 3' wide;
- The bottom landing would be in front of the Residential Entrance and would not slope more than 2% in any direction (a maximum of 1:48 perpendicular to the Building);
- The ramp between the top and bottom landings would be 5' long by 3' wide and have a slope of 1:10;
- The bottom landing would be 6" below the top landing;
- The walkway perpendicular to the bottom landing towards the Bedford Avenue curb would have a slope of 1:20; and
- The horizontal distance between the bottom landing and the street curb would be 144 inches.

See Badway Decl., Exhibits, 6, 7, and 10, at p. 121, ll. 15-17; Salmen Decl., at ¶¶ 22-26, 30.  It is not possible for the ramp to have a 1:12 slope due to the location of Residential Entrance.  See Badway Decl., Exhibits 6, 7, and 10, at p. 122, ll. 9-15.

The Proposal states that it is not intended to be a construction drawing and is "based on incomplete information, sidewalk elevations/slopes, property line locations, and basement hatch locations are estimated."  See Badway Decl., Exhibit 6.  Dr. Steinfeld does not know if the Proposal actually would work and if it would be possible to implement the Proposal because he does not have the actual elevations.[7]  See Badway Decl., Exhibit 10, at p. 124, ll. 2-22.  When

---

The change in elevation between the street curb, public sidewalk and Retail Entrance, along with the width of the public sidewalk, precludes the installation of a permanent ramp perpendicular to the Retail Entrance.  See Salmen Decl., at ¶ 18.

[7] Dr. Steinfeld also does not know if the Proposal complies with any local laws, codes, standards, or regulations.  See Badway Decl., Exhibit 10, at p. 72, ll. 16-25; see also Badway Decl., Exhibit 5.  Dr. Steinfeld does not know what regulatory bodies would need to approve the Proposal for it to be constructed, is not familiar with the New York City permitting and approval requirements for constructing the Proposal, has never dealt with or filed permits with the DOB or the DOT, does not have any knowledge of the New York City laws, rules, and regulations that affect Defendants' ability to carry out the Proposal, including, but not limited to, the New York City Building Code and the requirements of the DOB and the DOT, and does not know if the Proposal complies with those requirements or if it would be approved by the DOB and the DOT.  See Badway Decl., Exhibit 10, at p. 44, ll. 8-21, at p. 72, ll. 7-25, at p. 73, ll. 8-15, at pp. 127-28, ll. 3-22, and at p. 130, ll. 4-10.

Active\102566067.v5

inspecting the Subject Premises, Mr. White did not use a laser level to take any measurements and did not measure the distances and elevations of the various points along the proposed Ramp System. *See* Badway Decl., Exhibit 10, at p. 125, ll. 6-12, 15-17; *see also* Badway Decl., Exhibits 5 and 6. Accordingly, the Proposal does not take into consideration the change in elevation of the existing sidewalk between the face of the Building and the street curb. *See* Badway Decl., Exhibits 7 and 10, at pp. 123-24, ll. 15-16, and at p. 125, ll. 18-21; Salmen Decl., at ¶ 27. As a result, the Proposal miscalculates the distance that would be necessary for a new 1:20 sloped walkway to meet the surface of the sidewalk. *See* Salmen Decl., at ¶ 27.

The distance between the Step and the street curb is approximately 15', although the existing sidewalk between the Building storefront and the street curb is sloped. *See* Badway Decl., Exhibits 5 and 7; Salmen Decl., at ¶ 28. Defendants' expert, John Salmen, measured the elevations of the sidewalk from the face of the Building to the street curb using a Black and Decker CDL300S Auto Laser Level. *See* Badway Decl., Exhibit 7; Salmen Decl., at ¶ 28. Mr. Salmen found that the slope of the existing sidewalk between the Building storefront and the street curb ranges from 3.4% to 6.8%, averaging at approximately 4%. *See* Badway Decl., Exhibit 7; Salmen Decl., at ¶ 28.

Due to existing conditions, including the change in elevation of the sidewalk and the width of the sidewalk:

- The top of the street curb actually would be 7-1/2" below the bottom landing of Plaintiff's Ramp System;
- The height of the top landing of Plaintiff's Ramp System actually would be 8-5/8" above the existing sidewalk (requiring two steps and handrails leading to the top landing);
- The bottom landing of Plaintiff's Ramp System actually would be ½" above the sidewalk at the door to the Residential Entrance and approximately 1" above the sidewalk at its edge furthest from the Building;
- The slope of the walkway between the bottom landing of Plaintiff's Ramp System and the street curb would be steeper than 1:20 (5%) at 1/19.2 or 5.208%;
- The distance between the bottom landing of Plaintiff's Ramp System and a turning space

> adjacent to the street curb that is 36" wide with a 2% maximum slope in any direction would be 108 inches;
>
> • The slope of the walkway between the bottom landing of Plaintiff's Ramp System and a turning space adjacent to the street curb that is 36" wide with a 2% maximum slope in any direction would be 1:14.4 or 6.94%;
>
> • A 1:20 sloped walkway, as stated in the Proposal, would be impossible because it would need to be a minimum of 150 inches in length and, with the required level turning space at the bottom of the 1:20 sloped walkway, it would extend beyond the street curb a minimum of 42 inches into the street before it reached any existing ground surface; and
>
> • A 1:20 sloped walkway also would be obstructed by and require the relocation of a tree planting bed that is adjacent to the street curb in the existing sidewalk.

*See* Badway Decl., Exhibit 7; Salmen Decl., at ¶¶ 22, 25, 27-32.  Plaintiff's expert, Dr. Steinfeld, opined that the sloped walkway potentially would need to project beyond the street curb to maintain the required 1:20 slope.  *See* Badway Decl., Exhibit 10, at p. 126, ll. 6-16.

To overcome the barrier posed by the Step, The Meatball Shop voluntarily has maintained and used a portable ramp for wheelchair users like Plaintiff to enter and exit the Subject Premises and implemented procedures for assisted entry to the Restaurant (since prior to the commencement of the Action).[8]  *See* Declaration of Rhon Glasgow, dated October 4, 2019 ("Glasgow Decl."), at ¶¶ 4-6 and Exhibits 1-3; Salmen Decl., at ¶ 34; Badway Decl., Exhibit 7. Adjacent to the Retail Entrance on the exterior of the Building, there is a doorbell designated with the International Symbol of Accessibility and the text "PLEASE RING BELL FOR ASSISTANCE" (collectively, "Doorbell and Signage").  *See* Glasgow Decl., at ¶¶ 7-8; Salmen Decl., at ¶ 35.  The purpose of the Doorbell and Signage is to facilitate access to the Subject Premises by persons with disabilities through the deployment of the Portable Ramp and staff assistance.  *See* Glasgow Decl., at ¶ 9.

The Meatball Shop's front-of-house employees monitor the Retail Entrance.  *See* Glasgow Decl., at ¶ 10.  If a person in a wheelchair indicates that he or she wishes to enter the

---

[8] The Meatball Shop purchased a new portable ramp ("Portable Ramp") on October 23, 2017. *See* Badway Decl., Exhibit 7; Glasgow Decl., at ¶¶ 5-6.

Subject Premises, either through visual cues or by ringing the Doorbell, an employee of The Meatball Shop immediately opens the door to the Retail Entrance and locks it in an open position.[9]  *See* Glasgow Decl., at ¶ 11; Badway Decl., Exhibit 9; Salmen Decl., at ¶ 36.  After locking the door to the Retail Entrance in an open position, The Meatball Shop employee retrieves and deploys the Portable Ramp by placing it on the sidewalk and over the lip of the Step at the Retail Entrance.  *See* Glasgow Decl., at ¶ 12; Salmen Decl., at ¶ 36.  The Meatball Shop employee then provides whatever assistance the patron in the wheelchair requests and/or needs to allow him or her to ascend the Portable Ramp, and then enter the Subject Premises.  *See* Glasgow Decl., at ¶ 13.  After the wheelchair-using patron enters the Subject Premises and is safely clear of the Portable Ramp, The Meatball Shop employee recovers the Portable Ramp, brings it inside the Subject Premises for storage, and closes the door to the Retail Entrance.  *See* Glasgow Decl., at ¶ 15; Salmen Decl., at ¶ 36.

After the wheelchair-using patron has concluded his or her dining experience at the Subject Premises, an employee of The Meatball Shop opens the door to the Retail Entrance, locks the door in an open position, retrieves the Portable Ramp, and deploys the Portable Ramp.  *See* Glasgow Decl., at ¶ 16.  The Meatball Shop employee then assists the wheelchair-using patron through the Retail Entrance and down the ramp, as needed.  *See* Glasgow Decl., at ¶ 16.  After the wheelchair-using patron is safely clear of the Portable Ramp, The Meatball Shop employee recovers the Portable Ramp, brings it inside the Subject Premises for storage, and closes the door to the Retail Entrance.  *See* Glasgow Decl., at ¶ 17; Salmen Decl., at ¶ 36.

The Portable Ramp is 3' wide by 8' long and composed of two hinged sections that each fold in half.  *See* Badway Decl., Exhibits 7 and 9; Salmen Decl., at ¶ 37.  The overall rise of the

---

[9] There is a hook on the exterior wall and an eye at the bottom of the outside of the door.  *See* Glasgow Decl., at ¶ 11; Salmen Decl., at ¶ 36.

Active\102566067.v5

Portable Ramp from bottom to top is greater than the height of the Step because the existing sidewalk slopes away from the Building toward the street at a slope of approximately 4%.  *See* Badway Decl., Exhibit 9; Salmen Decl., at ¶ 37.  The running slope at the top section of the Portable Ramp is 9.4%.  *See* Badway Decl., Exhibit 9; Salmen Decl., at ¶ 37.  The running slope at the bottom section of the Portable Ramp is 13.6%.  *See* Badway Decl., Exhibit 9; Salmen Decl., at ¶ 37.  A hinged flap at the top of the Portable Ramp is 2-3/4" in length and rises 1/2" above the Step, with the edge of the flap presenting a 1/4" high maximum abrupt vertical level change from the surface of the Step.  *See* Badway Decl., Exhibit 9; Salmen Decl., at ¶ 39.

There is space at the bottom of the Portable Ramp for pedestrians to navigate past the Portable Ramp and for wheelchair users to navigate onto the Portable Ramp.  *See* Badway Decl., Exhibit 9; Salmen Decl., at ¶ 38.  A width of 36-1/2" is provided at the bottom of the Portable Ramp to the edge of the sidewalk pavers bordering the planting boulevard that is a distance of 50 inches from the edge of the street curb.  *See* Badway Decl., Exhibit 9; Salmen Decl., at ¶ 38.  Given the existing sidewalk condition, the Portable Ramp is likely the maximum length portable ramp that is possible for use at the Subject Premises.  *See* Badway Decl., Exhibit 9.

## B.   DINING ROOM

Dr. Steinfeld and Mr. Salmen agree that Defendants are in compliance with their obligations under the ADA with respect to the Restaurant's seating if the 1991 ADA Standards for Accessible Design ("1991 Standards") apply.  *See* Badway Decl., Exhibits 5, 7, and 10, at pp. 75-76, ll. 1-10; Salmen Decl., at ¶ 40.  More than 5% of the dining positions within the Subject Premises are accessible.  *See* Badway Decl., Exhibits 5 and 7; Salmen Decl., at ¶ 40.  Additionally, there is accessible seating near the bar, and the same service and menu is provided at all seating in the Restaurant, including at tables in the bar area and at the bar counter.  *See*

Badway Decl., Exhibits 7 and 10, at p. 76, ll. 2-7; Glasgow Decl., at ¶ 18.

The Restaurant has a service counter with a cash register.  *See* Badway Decl., Exhibit 7; Salmen Decl., at ¶ 42; Glasgow Decl., at ¶ 19.  However, it is an employee workstation for employee use.  *See* Badway Decl., Exhibit 7; Salmen Decl., at ¶ 42; Glasgow Decl., at ¶ 20. There are no transactions undertaken or completed by guests at this service counter.  *See* Badway Decl., Exhibit 7; Salmen Decl., at ¶ 42; Glasgow Decl., at ¶ 21.  The Meatball Shop's policy is to offer tableside service for guests to complete all transactions, including paying their checks.  *See* Badway Decl., Exhibit 7; Salmen Decl., at ¶ 42; Glasgow Decl., at ¶ 22.

There is a cane-detectable element below the service counter, located directly on the finished floor.  *See* Declaration of Adam Rosenbaum, dated October 18, 2019 ("Rosenbaum Decl."), at ¶¶ 18-19 and Exhibit 6; Salmen Decl., at ¶¶ 43-44.  The element extends 11-3/4 inches above the finished floor and 8-1/8 inches from the face of the wall beneath the service counter, thereby presenting a detectable element within 4 inches horizontally of all parts of the protruding counter.  *See* Rosenbaum Decl., at ¶¶ 18-19 and Exhibit 6; Salmen Decl., at ¶ 44.

## C.   TOILET ROOMS

The Restaurant has two single-user toilet rooms across the hallway from each other at the rear of the Subject Premises.  *See* Badway Decl., Exhibit 7; Salmen Decl., at ¶ 46; Glasgow Decl., at ¶ 23.  One of them is and has been designated an accessible toilet room ("Accessible Toilet Room").  *See* Badway Decl., Exhibit 7; Salmen Decl., at ¶ 46; Glasgow Decl., at ¶ 23.

In the Accessible Toilet Room, the water closet is located in a space that has 36 inches between the side wall and the lavatory.  *See* Badway Decl., Exhibit 7; Salmen Decl., at ¶ 47.  Dr. Steinfeld and Mr. Salmen agree that the lavatory is within the toilet clearance overlap in accordance with the 1991 Standards.  *See* Badway Decl., Exhibits 5 and 7; Salmen Decl., at ¶ 47.

Active\102566067.v5

The knee and toe clearance at the lavatory is 30-1/2" wide and more than 48 inches deep for a forward approach. *See* Badway Decl., Exhibit 7; Salmen Decl., at ¶ 47.  At a height of 27 inches above the finished floor, the knee clearance under the lavatory is 9 inches deep, as measured from the front edge of the lavatory to the face of the pipe shroud. *See* Badway Decl., Exhibit 7; Salmen Decl., at ¶ 47.  The front of the water closet is located 18-1/2" from the sidewall and the back of the water closet is located 18-1/8" from the sidewall. *See* Badway Decl., Exhibit 7; Salmen Decl., at ¶ 50.

There are side and rear wall grab bars around the water closet in the Accessible Toilet Room.  In 2017, the rear wall grab bar was 28 inches in length and the side wall grab bar extended 52 inches in length from the rear wall.  *See* Badway Decl., Exhibits 5 and 7; Salmen Decl., at ¶¶ 52, 56.  Both the rear and side wall grab bars were 37-1/2 inches above the finished floor, as measured to the top of the gripping surface of the grab bar, and 36-5/8 inches above the finished floor, as measured to the centerline of the grab bar.  *See* Badway Decl., Exhibits 5 and 7; Salmen Decl., at ¶¶ 52, 57.  The diameter of the rear and side wall grab bars was 1-3/4 inches in length.  *See* Badway Decl., Exhibits 5 and 7; Salmen Decl., at ¶¶ 52, 57.

Currently, the rear wall grab bar in the Accessible Toilet Room is 30 inches in length, has a diameter of 1-1/4 inches, and is located 36 inches above the finished floor as measured top of the gripping surface.  See Rosenbaum Decl., at ¶¶ 7-8, 11 and Exhibit 3; Salmen Decl., at ¶¶ 53-54.  The space between the rear wall in the Accessible Toilet Room and the rear wall grab bar is 1-1/2 inches.  *See* Rosenbaum Decl., at ¶¶ 9, 11 and Exhibit 3; Salmen Decl., at ¶¶ 53-54.  Due to the geometry of the space, a 36-inch grab bar will not fit in the space between the toilet side wall and the lavatory.  *See* Badway Decl., Exhibits 5, 7, and 10, at pp. 96-97, at ll. 15-2; Rosenbaum Decl., at ¶¶ 10-11 and Exhibit 3; Salmen Decl., at ¶ 55.  The rear wall grab bar in place is the

longest grab bar that can be installed.  *See* Rosenbaum Decl., at ¶¶ 10-11 and Exhibit 3; Salmen Decl., at ¶ 55; Badway Decl., Exhibit 10, at pp. 96-97, at ll. 15-2.

Currently, the side wall grab bar in the Accessible Toilet Room is 48 inches in length, has a diameter of 1-1/4 inches, and is located 36 inches above the finished floor as measured top of the gripping surface.  *See* Rosenbaum Decl., at ¶¶ 7, 12, 15 and Exhibit 4; Salmen Decl., at ¶¶ 58-59.  The side wall grab bar is located approximately 6 inches from the rear wall and extends to a distance of over 54 inches from the rear wall.  *See* Rosenbaum Decl., at ¶¶ 7, 14, 15 and Exhibit 4; Salmen Decl., at ¶¶ 58-59.  The space between the side wall and the side wall grab bar is 1-1/2 inches.  *See* Rosenbaum Decl., at ¶¶ 7, 13, 15 and Exhibit 4; Salmen Decl., at ¶¶ 58-59.

Other features and elements of the Accessible Toilet Room include:

- A toilet paper dispenser that is centered 8-7/8" in front of the water closet;[10]
- A full-length mirror located on the back of the door with its bottom edge reflecting surface 18 inches above the finished floor;
- A coat hook located at approximately 39 inches above the finished floor; and
- A moveable wastebasket located beside the lavatory, allowing 31 inches wide knee and toe clearance under the lavatory.[11]

*See* Badway Decl., Exhibits 5, 7, and 10, at p. 90, ll. 14-16, at pp. 91-92, ll. 16-20; Salmen Decl., at ¶¶ 49, 51, 60-61.

In 2017, the height of the abrupt portion of the Accessible Toilet Room door threshold was 9/16 of an inch on the Accessible Toilet Room side of the door threshold.  *See* Badway Decl., Exhibits 5 and 7; Salmen Decl., at ¶ 62.  Dr. Steinfeld and Mr. Salmen agree that 1/16 of an inch is a reasonable construction tolerance for the Accessible Toilet Room door threshold.

---

[10] The Meatball Shop does not store or intend to store excess toilet paper rolls in the Accessible Toilet Room.  *See* Badway Decl., Exhibit 7; Salmen Decl., at ¶ 51; Glasgow Decl., at ¶ 25.

[11] There currently is no cabinet in the Accessible Toilet Room, and The Meatball Shop does not have any intention to install a cabinet in the future.  *See* Badway Decl., Exhibit 7; Salmen Decl., at ¶ 48; Glasgow Decl., at ¶ 24.

Active\102566067.v5

*See* Badway Decl., Exhibit 10, at p. 113, at ll. 21-25; Salmen Decl., at ¶ 62.

Currently, the height of the abrupt portion of the Accessible Toilet Room door threshold is less than 1/4 of an inch on the Accessible Toilet Room side of the door threshold.  *See* Rosenbaum Decl., at ¶¶ 5-6 and Exhibit 2; Salmen Decl., at ¶ 63.  The remaining height of the door threshold on the inside of the Accessible Toilet Room side of the door threshold is approximately 1/2 of an inch and is beveled over a distance of 2-1/4 inches.  *See* Rosenbaum Decl., at ¶¶ 5-6 and Exhibit 2; Salmen Decl., at ¶ 63.

There is a sign displaying the International Symbol of Accessibility at the Accessible Toilet Room ("ISA Sign").  *See* Rosenbaum Decl., at ¶¶ 2, 4 and Exhibit 1; Salmen Decl., at ¶ 64.  The ISA Sign supplements existing signage with high contrast, raised character and braille. *See* Rosenbaum Decl., at ¶¶ 3, 4 and Exhibit 1; Salmen Decl., at ¶ 64.  The ISA Sign is on a pictogram field that is 6 inches in height.  *See* Rosenbaum Decl., at ¶¶ 2, 4 and Exhibit 1; Salmen Decl., at ¶ 65. The baseline of the lowest tactile character of the existing signage is 49-1/2 inches above the finished floor. *See* Rosenbaum Decl., at ¶¶ 3, 4 and Exhibit 1; Salmen Decl., at ¶ 65.

There is a cane-detectable element below the hand-drying equipment in the Accessible Toilet Room.  *See* Rosenbaum Decl., at ¶¶ 16-17 and Exhibit 5; Salmen Decl., at ¶ 66.  The cane-detectable element extends 3-1/4 inches from the wall and is located approximately 10 inches above the finished floor.  *See* Rosenbaum Decl., at ¶¶ 16-17 and Exhibit 5; Salmen Decl., at ¶ 67. It presents a detectable element within 4 inches horizontally of all parts of the protruding hand dryer.  *See* Rosenbaum Decl., at ¶¶ 16-17 and Exhibit 5; Salmen Decl., at ¶ 67.

## D.    RECORD OF ACCOMMODATING PERSONS WITH DISABILITIES

The Meatball Shop has no record of Plaintiff having accessed or attempted to access the Restaurant.  *See* Glasgow Decl., at ¶ 27.  Similarly, The Meatball Shop has no record of Plaintiff

having contacted or otherwise communicated with The Meatball Shop. *See id.*  Aside from

Plaintiff's filing of the Complaint in this Action, The Meatball Shop has not received any

complaint—formal or informal—alleging any discrimination at the Restaurant or issues

regarding the Restaurant's accessibility, including the use of the Portable Ramp at the

Restaurant's entrance  *See* Glasgow Decl., at ¶ 28.  To the contrary, persons with physical

disabilities, including persons in wheelchairs, have accessed the Restaurant, have had a full and

equal opportunity to participate in and enjoy the Restaurant, and have benefited from the goods

and services of the Restaurant.  *See* Glasgow Decl., at ¶ 2.

For the following reasons, Defendants deny that any of Plaintiff's allegations of

purported barriers contained in the Complaint and/or Plaintiff's Expert Report give rise to any

violation of the ADA or state or city laws.  Therefore, Defendants maintain that summary

judgment should be granted in favor of Defendants.

## LEGAL ARGUMENT

### POINT I

### DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE THERE IS NO GENUINE DISPUTE OF MATERIAL FACT

Pursuant to FRCP 56(a):

> A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

FRCP 56(a).  The court's analysis concerns "the threshold inquiry of determining whether there

is the need for a trial—whether, in other words, there are any genuine actual issues that properly

can be resolved only by a finder of fact because they may reasonably be resolved in favor of

either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the evidentiary record,] which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *See Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quoting *Stuart v. American Cyanamid Co.*, 158 F.3d 622, 626 (2d Cir. 1998).  A fact is "material" only if its resolution will affect the outcome of the lawsuit.  *See Anderson*, 477 U.S. at 248; *Bouboulis v. Transport Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006).  "The applicable substantive law determines which facts are critical and which are irrelevant."  *Panzica v. Mas-Maz, Inc.*, No. CV 05-2595 (ARL), 2007 WL 1732123, at *4 (E.D.N.Y. June 11, 2007)

To defeat a motion for summary judgment, the party opposing the motion must raise a genuine issue of material fact.  *See Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005).  The party "may not rely on conclusory allegations or unsubstantiated speculation," *id.*, including "contentions that the affidavits supporting the motion are not credible." *Ying Jing Gan v. City of New* York, 996 F.2d 522, 532-33 (2d Cir. 1993) (quotations and citations omitted).  It must do more than establish "some metaphysical doubt as to the material facts." *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Matsushita Elec. Indus. Co. v. Zenit Radio Corp.*, 475 U.S. 574, 586 (1986)).  The party opposing the motion must present "sufficient evidence supporting the claimed factual dispute . . . to require a jury or judge to resolve the parties' differing versions of the truth at trial."  *McClellan*, 439 F.3d at 144 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968)).

The court must view the summary judgment motion in the light most favorable to the

party opposing the motion and draw all justifiable inferences in that party's favor.  *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *All State Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.*, 473 F.3d 450, 456 (2d Cir. 2007).  Summary judgment is inappropriate "if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citing *Pinto v. Allstate Inc. Co.*, 221 F.3d 394, 398 (2d Cir. 2000)).

"[T]he summary judgment standard applies with equal force to discrimination cases as it does to other cases." *Panzica*, 2007 WL 1732123, at *4 (citing *Faruq v. Wal-Mart Stores, Inc.*, 2006 U.S. Dist. LEXIS 4675, at *12 (W.D.N.Y. Jan. 23, 2006)); *see also Ashton v. Pall Corp.*, 32 F. Supp. 2d 82, 87 (E.D.N.Y. 1999) ("The salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to commercial or other areas of litigation.") (quotation omitted).  For the reasons set forth below, here, there is no genuine dispute as to any material fact, and, therefore, summary judgment is proper and warranted.

## POINT II

## DEFENDANTS ARE IN COMPLIANCE WITH THE AMERICANS WITH DISABILITIES ACT AND APPLICABLE STATE AND CITY LAWS

Plaintiff asserts claims of disability discrimination in violation of the ADA, the New York City Human Rights Law, the New York State Human Rights Law, and the New York State Civil Rights Law.  Plaintiff's disability discrimination claims under state and local law are predicated upon his ADA claims, as the Complaint does not contain any unique allegations specific to his state and local law claims.  These state and local law claims generally are governed by the same legal standards as his ADA claims, and, therefore, it is proper to evaluate the Claims under the standards set forth by the ADA.  *See Hartnett v. Fielding Graduate*

*Institute*, 400 F. Supp. 2d 570, 581 (S.D.N.Y. 2005), *aff'd in part and rev'd in part on other grounds*, 198 Fed.Appx. 89 (2d Cir. 2006) (summary order).

The ADA prohibits discrimination against individuals "on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a); *see also* 42 U.S.C. § 12182(b).  To prevail on an ADA claim, a plaintiff must establish: (1) that the plaintiff is disabled within the meaning of the ADA; (2) that the defendants own, lease, or operate a place of public accommodation; and (3) that the defendants discriminated against the plaintiff within the meaning of the ADA.  *See Roberts v. Royal Atlantic Corp.*, 542 F.3d 363, 368 (2d Cir. 2008); *Camarillo v. Carrols Corp.*, 518 F.3d 153, 1156 (2d Cir. 2008).

Defendants assume, for purposes of this Motion only, that Plaintiff is disabled within the meaning of the ADA, and that all Defendants own, lease, or operate a place of public accommodation.  Accordingly, the sole issue for the Court to address is if Defendants discriminated against Plaintiff within the meaning of the ADA based on the alleged architectural barriers identified by Plaintiff in the Complaint and Plaintiff's Expert Report.

For facilities like the Building that existed prior to the enactment of the ADA, accessibility discrimination includes: (1) a failure to make "alterations" that are "readily accessible ... to the maximum extent feasible;" and (2) in the absence of alterations, a failure to remove any existing architectural barriers to accessibility where such removal is "readily achievable."  *See* 42 U.S.C. § 12183(a)(2); 42 U.S.C. § 12182(b)(2)(A)(iv); *Roberts*, 542 F.3d at 369; *Marradi v. Galway House, Inc.,* No. 13-10813 (RGS), 2014 WL 1454266, at *4 (D. Mass. Apr. 15, 2014).

### A. THE "READILY ACHIEVABLE" BARRIER REMOVAL STANDARD APPLIES TO THE STEP AND PLAINTIFF BEARS (AND FAILS TO SATISFY) THE INITIAL BURDEN OF PROOF

Here, Defendants have not made any alterations to the Step at the Retail Entrance to the

Subject Premises.  Therefore, the Step is an unaltered portion of an "existing building," and the

"readily achievable" barrier removal standard is applicable to Plaintiff's claims regarding the

alleged barrier posed by the Step.  *See* 42 U.S.C §12182(b)(2)(A)(iv); *Rodriguez v. Barrita, Inc.*,

10 F. Supp. 3d 1062, 1073 (N.D. Cal. 2014).

Plaintiff "bear[s] the burden of proving the existence of an architectural barrier."

*Pascuiti v. New York Yankees*, No. 98 Civ. 8186 (SAS), 1999 WL 1102748, at *4 (S.D.N.Y.

Dec. 6, 1999).  Given that Plaintiff alleges discrimination due to an architectural barrier, Plaintiff

also must establish his burden of production by "articulat[ing] a plausible proposal for barrier

removal, 'the costs of which, facially, do not clearly exceed its benefits.'"  *Roberts*, 542 F.3d at

373 (citing *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 138 (2d Cir. 1995)).  Plaintiff must

provide at least some estimate of costs and "proffer evidence . . . as to the ease and

inexpensiveness of [his] proposed method of barrier removal." *Pascuiti*, 1999 WL 1102748, at

*4; *see also Roberts*, 542 F.3d at 377-78; *Kreisler v. Second Ave. Diner Corp.*, No. 10 Civ. 7582

(RJS), 2012 WL 3961304, at *7-9 (S.D.N.Y. Sept. 11, 2012), *aff'd*, 731 F.3d 184 (2d Cir. 2013);

*Panzica*, 2007 WL 1732123, at *5.  Defendants may rebut Plaintiff's case by demonstrating that

the removal of the architectural barrier at issue is not readily achievable because it could not be

accomplished without much difficulty or expense.  *See Roberts*, 542 F.3d at 378; *Pascuiti*, 1999

WL 1102748, at *4.

Plaintiff has failed to satisfy his initial burden because he has not provided a plausible

proposal for barrier removal.  Plaintiff's sole Proposal is not only difficult (and expensive), but

virtually impossible to undertake, as explained above and in greater detail below.  Accordingly, Plaintiff's claims pertaining to the alleged barrier posed by the Step must be dismissed.

### B.     THE REMOVAL OF THE STEP IS NOT READILY ACHIEVABLE

Even if Plaintiff somehow is able to make the required initial showing, Defendants have established that the removal of the alleged architectural barrier at issue is not readily achievable. The ADA defines readily achievable as "easily accomplished and able to be carried out without much difficulty or expense."  42 U.S.C. §12181(9); *see also Colorado Cross Disability Coal. v. Hermanson Family Ltd.*, 264 F.3d 999, 1002 (10th Cir. 2001).  Both monetary and non-monetary considerations are included in the "readily achievable" analysis.  *See Roberts*, 542 F.3d at 373.  Accordingly, factors other than cost, such as difficulty, are relevant to determining if barrier removal is "readily achievable." *Wasco v. T Corp.,* No. 04-0088 (JR), 2008 WL 53707, at *3 (D.D.C. Jan. 3, 2008).

Critically, the readily achievable standard does not mandate barrier removal that requires extensive restructuring.  *See* ADA Title III Technical Assistance Manual § III-4.4200.  Here, Plaintiff's Proposal for barrier removal requires extensive restructuring. Moreover, it would be "difficult" to implement the Proposal because it is technically infeasible and Defendants would be unable to obtain the required regulatory approvals, as explained below. Seeking such approvals would be merely a futile effort, and Plaintiff has failed to establish that there is any likelihood that the DOB and the DOT would provide the necessary approvals.  *See De La Rosa v. 597 Broadway Develop. Corp.*, No. 13-CV-7999 (LAK)(MHD), 2015 WL 7351540, at *12-13 (S.D.N.Y Aug. 4, 2015) (finding that defendant "carried its burden to demonstrate, beyond triable dispute, that approval of [a permanent] ramp would be virtually impossible" and explaining that plaintiff's "attempt to impose an administrative exhaustion

requirement" was "misguided"); *Hermanson Family Ltd.*, 264 F.3d at 1009 ("Plaintiff failed to present any evidence to establish the likelihood that the City … would approve a proposed modification ….").

Since the removal of the alleged barrier to access is not readily achievable, Defendants may provide alternative methods or means of access.  Portable ramps provide a compliant means of access "when installation of a permanent ramp is not readily achievable," and Defendants are using the maximum length portable ramp that is feasible, given existing conditions.  28 C.F.R. §36.304(e).  Therefore, Defendants have satisfied their obligations under the ADA and related state and city laws by installing the Doorbell and Signage, providing the Portable Ramp, and implementing procedures to provide assisted entry to the Restaurant.

## C.   THE ENTRANCE IS ACCESSIBLE TO THE MAXIMUM EXTENT FEASIBLE AND ALL OTHER ELEMENTS COMPLY WITH THE APPLICABLE ADA STANDARDS FOR ACCESSIBLE DESIGN

Assuming, for purposes of argument, that the alteration standard applies (and not the barrier removal standard), Defendants still are in compliance with their obligations under the ADA.  To establish the existence of an alteration, a plaintiff needs to make a "facially plausible demonstration" that a modification to a facility is an alteration under the ADA.  *Roberts*, 542 F.3d at 371.  The burden then shifts to the defendant to establish that the modification is not an alteration.  *See id.*

If this Court presumes that alterations were made to the Step (or that alterations to the Restaurant's primary function area (*e.g.*, dining room) triggered an obligation regarding Retail Entrance and the Step), Defendants would be required to make an accessible entrance "to the maximum extent feasible."  28 C.F.R. § 36.402(c).  In the context of the ADA, alterations are defined as "change[s] to[] place[s] of public accommodation ... that affect[] or could affect the

usability of [a] facility or any part thereto."  28 C.F.R. §36.402(b).  "Alterations include, but are not limited to, remodeling, renovation, rehabilitation, reconstruction, historic restoration, changes or rearrangement in structural parts or elements, and changes or rearrangement in the plan configuration of walls and full-height partitions.  Normal maintenance, reroofing, painting or wallpapering, asbestos removal, or changes to mechanical and electrical systems are not alterations unless they affect the usability of the building or facility."  28 C.F.R. § 36.402(b)(1).

"[T]he concept of 'alteration' is a relative one, requiring [a court] to consider the nature, cost, degree, scope, and purpose of any alleged alteration."  *Roberts*, 542 F.3d at 370.  The following non-exhaustive list of considerations may be used to determine if modifications constitute alterations under the ADA:

1.  The overall cost of the modification relative to the size (physical and financial) of the facility or relevant part thereof;

2.  The scope of the modification (including what portion of the facility or relevant part thereof was modified);

3.  The reason for the modification (including whether the goal is maintenance or improvement, and whether it is to change the purpose or function of the facility); and

4.  Whether the modification affects only the facility's surfaces or also structural attachments and fixtures that are part of the realty.

*Roberts*, 542 F.3d at 370.

Alterations "shall be made so as to ensure that, to the maximum extent feasible, the altered portions of the facility are readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs."  28 C.F.R. §36.402(a)(1).  "The phrase 'to the maximum extent feasible' … applies … where the nature of an existing facility makes it virtually impossible to comply fully with applicable accessibility standards through a planned alteration."  28 C.F.R. §36.402(c).

In the event that Plaintiff is able to establish the existence of "alterations," then the applicable 1991 Standards or 2010 ADA Standards for Accessible Design ("2010 Standards") would dictate compliance with the ADA since they establish technical requirements for the alteration of existing facilities.  Significantly, alterations made between September 15, 2010, and March 15, 2012, may comply with either the 1991 Standards or the 2010 Standards.[12]  *See* 28 C.F.R. § 36.406(a)(2).

Since all modifications to the Subject Premises at issue were completed prior to the Restaurant's opening in July 2011, the 1991 Standards may be used to determine whether any altered portions of the Restaurant comply with the ADA, unless the 2010 Standards "reduce the technical requirements or the number of required accessible elements below the number required by the 1991 Standards."  28 C.F.R. § 36.211(c).  In such a scenario, "the technical requirements or the number of accessible elements … may be reduced in accordance with the requirements of the 2010 Standards."  28 C.F.R. § 36.211(c).  In the event that alterations completed before March 15, 2012, do not comply with the 1991 Standards, the remedy is to require them to be made accessible in accordance with the 2010 Standards.  *See* 28 C.F.R. § 36.406(a)(5)(ii); *Range v. 535 Broadway Group LLC*, No. 17-cv-00423 (WHP), 2019 WL 4182966 (S.D.N.Y. Sept. 3, 2019) (explaining that alterations originally subject to the 1991 Standards at the time of alteration will be ADA-compliant if they now conform with the 2010 Standards).

　　a.　*Entrance*

Here, the primary issue is the Step at the Retail Entrance.  Notwithstanding the fact that The Meatball Shop provides access to the Restaurant through the Portable Ramp and staff

---

[12] Similarly, under the barrier removal standard, elements in existing facilities that were not altered on or after March 15, 2012, and that comply with the 1991 Standards, are not required to comply with the 2010 Standards.  *See* 28 C.F.R. § 36.304(d)(2).

assistance, Plaintiff claims that Defendants are required to install a permanent ramp complying with Section 405 of the 2010 Standards per Plaintiff's Proposal.  However, Defendants already have made the Retail Entrance accessible to the maximum extent feasible because it is technically infeasible (and, therefore, "virtually impossible") to implement the Proposal or to otherwise construct a permanent ramp to provide access to the Restaurant.  Compliance with the 2010 Standards is technically infeasible if "something that has little likelihood of being accomplished because … existing physical or site constraints prohibit modification or addition of elements, spaces, or features that are in full and strict compliance with the minimum requirements."  2010 Standards, Section 106.5; *see also* 2010 Standards, Section 202.3, Exception 2.

As explained above, the Retail Entrance is located between the Cellar Hatch and the Residential Entrance, neither of which may be blocked.  The Cellar Hatch is directly adjacent to the Retail Entrance on the left side and the Residential Entrance is 5'-6" from the Retail Entrance on the right side.  Moreover, between the Retail Entrance and the Residential Entrance is a fire sprinkler connection that protrudes from the face of the Building into this area above the sidewalk.  These and other existing site constraints prohibit the installation of a permanent ramp.

Critically, it is impossible to install a compliant permanent ramp in front of the Subject Premises due to the width of the existing sidewalk and the change in elevation of the existing sidewalk between the face of the Building and the street curb.  As explained above, there is insufficient space to provide a required 1:20 sloped walkway or to provide a required turning space that is 36" wide with a 2% maximum slope in any direction.  In fact, the sloped walkway and required level turning space would extend well beyond the street curb and into the street.  Accordingly, the Proposal would be unusable by a person in a wheelchair because there is no

place at the end of the sloped walkway to make a turn to or from the sidewalk—it would create a pedestrian tripping hazard and create a non-compliant sidewalk cross-slope.

In preparing the Proposal, Plaintiff's expert failed to consider the change in elevation of the existing sidewalk between the face of the Building and the street curb. Plaintiff's expert did not measure the distances and elevations of the various points along the proposed Ramp System. Dr. Steinfeld even admitted that he does not know if the Proposal actually would work and if it would be possible to implement the particular design set forth in the Proposal because he does not have the actual elevations. In contrast, Defendants' expert measured the elevations of the sidewalk from the face of the Building to the street curb using a laser level.

Notwithstanding the existing site constraints, the construction of a permanent ramp cannot be undertaken without the approval of the DOB and the DOT. Seeking such approval would be a futile effort because the installation of a permanent ramp in front of the fire sprinkler connection would violate the New York City Fire Code and the installation of the required top and bottom landings would violate the DOT's revocable consent regulations since they would project more than 44" from the Building's property line, among other reasons. *See De La Rosa*, 2015 WL 7351540, at *12-13; *Hermanson Family Ltd.*, 264 F.3d at 1009. In these circumstances, there is no evidence of any likelihood that the DOB and the DOT would approve an application for the construction of a permanent ramp at the Building to provide access to the Subject Premises. Moreover, Dr. Steinfeld does not have any expertise regarding the DOB and the DOT and has admitted that he is unable to offer any opinion as to the likelihood that these regulatory bodies would approve the Proposal.

For all of these reasons, Defendants have provided an accessible entry to the Restaurant to the maximum extent feasible and have satisfied any obligations that they may have under the

25

ADA's alteration standard (if, for purposes of argument, it applies).

      *b.   Dining Room*

Based on the expert reports and Dr. Steinfeld's deposition testimony, it is undisputed that, if the 1991 Standards apply (they do), then the Restaurant has a sufficient number of accessible seating positions, no dispersion would be required, and The Meatball Shop would not be required to lower a portion of its bar counter. The Restaurant's bar counter, like all elements within the Restaurant, predates the effective date of the 2010 Standards. The height of the bar counter exceeds 34 inches; however, The Meatball Shop provides the same goods and services at accessible seating adjacent to the bar in the bar area in compliance with § 5.2 of the 1991 Standards. Accordingly, Defendants' bar counter does not violate the ADA. *See Kreisler*, 2012 WL 3961304, at *11 (finding that the plaintiff failed to establish that services provided at a counter were unavailable at other tables that were accessible).

Plaintiff is mistaken that the service counter containing a cash register violates the ADA because the service counter is merely an employee workstation. All transactions are undertaken tableside. The Restaurant's practice is to present checks to and take payment directly from guests at their tables. Given this service, there is no need for any guest interaction with the counter surface at issue. Accordingly, the ADA does not apply to the Restaurant's service counter containing a cash register. *See* 2010 Standards, Section 203.9.

The service counter is not a protruding object because The Meatball Shop has a cane-detectable element below the counter. The element is detectable within 4 inches horizontally of all parts of the protruding counter in compliance with Section 307 of the 2010 Standards.

      *c.   Toilet Rooms*

Initially, only one of the Restaurant's two toilet rooms is required to be accessible, as the

2010 Standards reduce the number of required accessible toilet rooms and provide an exception where multiple single user toilet rooms are clustered at a single location. *See* 2010 Standards, Section 213.2, Exception 4.  The Restaurant's Accessible Toilet Room complies with the 1991 Standards and/or any reduced technical requirements in the 2010 Standards.  There is sufficient clear floor space, as the lavatory is within the toilet clearance overlap in accordance with the 1991 Standards at 4.16.2 and Fig. 28.  Moreover, there is sufficient knee and toe clearance at the lavatory and beneath the lavatory, and the moveable wastebasket is located beside the lavatory in a position that does not affect the required clearances.  The toilet centerline dimension is within reasonable construction tolerance for field conditions as permitted by the 1991 Standards, the grab bars comply with all requirements of the 2010 Standards (the rear wall grab bar cannot be any longer in the existing space), and the toilet paper dispenser is located in the proper location.

The Accessible Toilet Room has a compliant full-length mirror and a coat hook within accessible reach range.  The hand-drying equipment is not a protruding object because there is a cane-detectable element beneath it within 4 inches horizontally of all parts of the protruding hand-dryer.  The door threshold at the Accessible Toilet Room is compliant because the height of the abrupt portion is less than ¼ of an inch and the remaining height of ½ of an inch is beveled over a distance of 2-1/4 inches.  Finally, the ISA Sign is compliant because it is located on a pictogram field that is 6 inches in height.

## POINT III

### PLAINTIFF'S NEGLIGENCE CLAIM FAILS AS A MATTER OF LAW

Plaintiff's common law negligence claim must be dismissed because claims premised on alleged accessibility violations under applicable statutes, as a matter of law, do not present a separate cause of action for common law negligence.  It is well-settled that a common law negligence claim based solely on alleged violations of accessibility statutes is not cognizable,

27

and that "a plaintiff may not establish a common-law negligence claim based purely on a failure to design a place of public accommodation in accordance with federal or state statutes, absent further injury." *Thomas v. Ariel West*, 242 F.Supp.3d 293, 305 (S.D.N.Y. March 15, 2017); *see also Francis v. Lo-Do Corp.*, No. 14-CV-5422 (KBF), 2014 WL 7180091 (S.D.N.Y. Dec. 5, 2014) (finding that a plaintiff's common law negligence claim failed because the plaintiff merely repeated language sufficient for the statutory claim—negligence in designing a place of public accommodation—and failed to allege additional facts that the defendants breached any common law duty that caused a physical or emotional injury to the plaintiff). Here, Plaintiff only alleges his common law negligence claim as a restatement of his statutory accessibility claims, and, therefore, the negligence claim must be dismissed.

In addition, under the law of negligence, for a duty to arise, a plaintiff must have been "within the zone of foreseeable harm." *Di Ponzio v. Riordan,* 679 N.E.2d 616, 618 (N.Y. 1997). Plaintiff has not asserted that he was ever a patron, a guest, or otherwise physically present at the Restaurant at any time. Accordingly, Plaintiff cannot have been within the zone of foreseeable harm that conceivably could trigger some duty to be owed to him under the negligence standard. Therefore, Plaintiff's common law negligence claim against Defendants must be dismissed.

## POINT IV

### PLAINTIFF IS NOT ENTITLED TO RECOVER ATTORNEYS' FEES BECAUSE PLAINTIFF'S CLAIMS ARE MERITLESS AND/OR MOOT

In view of the foregoing, all of Plaintiff's claims are either meritless or moot. To the extent that barriers remain, Plaintiff's claims regarding those barriers do not give rise to any violation of law because their removal is technically infeasible. For these reasons, Plaintiff ultimately will not be able to recover attorneys' fees in this action. *See Buckhannon Bd. and Care Home, Inc. v. West Virginia Dept. of Health and Human Res.*, 532 U.S. 598, 598-99 (2001)

(holding that a plaintiff was not a prevailing party entitled to attorneys' fees where the "defendant's voluntary change in conduct, although perhaps accomplishing what the plaintiff sought to achieve by the lawsuit, lack[ed] the necessary judicial *imprimatur* on the change"); *J.C. v. Reg'l Sch. Dist. 10, Bd. of Ed.*, 278 F.3d 119, 121 (2d Cir. 2002) (denying an award of attorneys' fees where the plaintiff's issues were resolved by committee decision rather than by judicial sanctions); *Bacon v. Walgreen Co.*, No. 14–CV–419 (JFB)(ARL), 2015 WL 1261408 (E.D.N.Y. Mar. 20, 2015) (finding that a plaintiff's claims were moot because the defendant remedied the alleged access barrier at issue and concluding that the plaintiff did not have a viable claim for attorney's fees).

## POINT V

## THE COURT SHOULD DECLINE JURISDICTION OVER THE STATE AND CITY LAW CLAIMS IF ANY OF THOSE CLAIMS SURVIVE SUMMARY JUDGMENT

In the event that the Court declines to dismiss Plaintiff's claims under New York State and New York City law, Defendants respectfully requests that the Court decline to exercise supplemental jurisdiction over those claims pursuant to 28 U.S.C. § 1367(c)(3).  *See Lockhart v. Coreas*, No. 10–CV–1644 (SJF)(ETB), 2011 WL 2516569, at *10 (E.D.N.Y. June 21, 2011) (granting motion for summary judgment regarding ADA claims and declining to exercise jurisdiction over remaining state law claim); *Panzica*, 2007 WL 1732123, at *10 (declining to exercise supplemental jurisdiction over state law claims because none of the alleged ADA violations survived summary judgment motion); *Stan v. Wal-Mart Stores, Inc.*, 111 F. Supp. 2d 119, 127 n. 4 (N.D.N.Y. 2000) (dismissing federal ADA claims and declining to exercise supplemental jurisdiction over state law claims).

## CONCLUSION

For the reasons set forth above, the Court should grant Defendants' Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, and grant such other and further relief as it deems just and proper.

Respectfully submitted:

Dated: New York, New York          FOX ROTHSCHILD LLP
       October 18, 2019

By: */s/ Ernest Edward Badway*
    Carolyn D. Richmond
    Ernest Edward Badway
    Jason B. Jendrewski
    101 Park Avenue, Suite 1700
    New York, New York 10178
    Telephone: (212) 878-7900
    Facsimile: (212) 692-0940
    *Attorneys for Defendants 172nd LLC, 170 Too
    Bedford, LLC, and 170 Bedford Restaurant,
    LLC*

Active\102566067.v5